**William E. BROCK, United States Secretary of Labor, Petitioner,**

v.

**CHICAGO ZOOLOGICAL SOCIETY and Occupational Safety and Health Review Commission, Respondents.**

No. 86–1771.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 2, 1986.

Decided June 8, 1987.

Sandra Lord, Div. Occupational Safety & Health, Office of Solicitor, U.S. Dept. of Labor (with whom on the brief was Mark J. Lerner), Washington, D.C., for petitioner.

Anne B. Shindell, Minahan & Peterson S.C., Milwaukee, Wis., for respondents.

Before WOOD, and POSNER, Circuit Judges, and WILL, Senior District Judge.[*]

WILL, Senior District Judge.

Respondent Chicago Zoological Society ("Society") operates the Brookfield Zoo in west suburban Chicago, Illinois. Following an inspection by officials of the Occupational Safety and Health Administration ("OSHA") in April 1979, the Secretary of Labor issued a citation against the Society and proposed a $2000 penalty for safety violations occurring on zoo premises. The citation charged violations of 29 C.F.R. § 1910.23(a)(8) for failing to guard floor holes in the Tropic World Building and 29 C.F.R. § 1910.252(e)(1)(i) for a lack of fall protection for a welder working on a fifteen foot platform.

The Society contested the citation on the ground that, as a "political subdivision" of a state, it was exempt from OSHA jurisdiction. 29 U.S.C. § 652(5). An administrative law judge ruled against the Society and in favor of the Secretary of Labor. The Occupational Safety and Health Review Commission ("Commission"), finding that the Society qualified as a political subdivision, reversed. We now reverse the Commission.

Section 3(5) of the Occupational Safety and Health Act of 1970 ("OSH Act" or

"Act"), 29 U.S.C. § 652(5), exempts "any State or political subdivision of a State" from the definition of the term "employer" and therefore from the coverage of the Act. The Secretary of Labor's regulations set forth a two-part test for determining whether an entity is a state or political subdivision. Under this test, any entity that is "(1) created directly by the State, so as to constitute a department or administrative arm of the government, or (2) administered by individuals who are controlled by public officials and responsible to such officials or to the general public" will be deemed to be a state or political subdivision under § 625(5). 29 C.F.R. § 1975.5(b). This test is identical to the formula the National Labor Relations Board has long used to determine whether an entity is a political subdivision exempt from the Board's jurisdiction under 29 U.S.C. § 152(2). *See NLRB v. Natural Gas Utility Dist.*, 402 U.S. 600, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971); *NLRB v. Austin Developmental Center*, 606 F.2d 785 (7th Cir. 1979). Though we know of no case interpreting the term "political subdivision" as it appears in § 652(5), both sides agree, first, that the Secretary's interpretive regulation is valid, and second, that the cases construing the comparable provision of § 152(2) offer authoritative guidance.

As the Commission found, the Society clearly fails the first branch of the two-part test. Demonstrating why this is so requires a bit of zoo history. In 1920, Edith Rockefeller McCormick granted a tract of land to the Forest Preserve of Cook County ("District") for purposes of maintaining a zoo. To develop plans for establishing the zoo, the president of the Cook County Board of Commissioners appointed two committees, one composed of fellow commissioners and one composed of prominent private citizens. In 1921, the two committees incorporated the Society under Illinois law as a private, nonprofit corporation. (The Society is also an exempt organization under 26 U.S.C. §§ 501(c)(3) for purposes of federal taxation). Two years later, the

---

[*] The Honorable Hubert L. Will, Senior District Judge of the Northern District of Illinois, is sitting by designation.

Illinois legislature authorized officials of the state's forest preserve districts to maintain zoological parks "or to contract with the directors or trustees of any zoological society on such terms and conditions as may to such corporate authorities seem best relative to the erection, operation and maintenance of a zoological park." An Act Concerning Zoological Parks in Forest Preserve Districts, 1923 Ill.Laws 476, § 1 (codified as amended at Ill.Rev.Stat. ch. 96½, ¶ 6801). Subsequently, in 1926, the District entered an operation and maintenance agreement with the Society giving the Society "the entire control and management of the zoo".[1]

■ This history establishes that the Society was not, in the words of the Secretary's regulation, "created directly by the state, so as to constitute a department or administrative arm of the government." 29 C.F.R. § 1975.5(b)(1). Though state officials were instrumental in the founding of the Society, they deliberately designed it as a private entity to be operated independently of the District and other state agencies. *See Truman Medical Center v. NLRB*, 641 F.2d 570 (8th Cir.1981) (medical center organized at the behest of city officials as a nonprofit corporation and obligated by contract to assume city's statutory duty to serve indigents held not a political subdivision). Unlike the District, for example, which was brought into existence by state law, *see* Ill.Rev.Stat. ch. 96½, ¶ 6302, the Society is merely approved by state law as a potential recipient of government contracts. Moreover, state law explicitly treats zoological societies as distinct from forest preserve districts. Ill.Rev.Stat. ch. 96½, ¶¶ 6443, 6801. These facts indicate that the Society's relationship with the state is essentially one of a private contractor rather than an administrative agency.

*See St. Jude Indus. Park Bd. v. NLRB*, 760 F.2d 223, 225 (8th Cir.1985); *Jefferson Cty. Community Center v. NLRB*, 732 F.2d 122, 125 (10th Cir.), *cert. denied*, 469 U.S. 1086, 105 S.Ct. 591, 83 L.Ed.2d 701 (1984).

The second branch of the Secretary's two-part test asks whether the Society is "administered by individuals who are controlled by public officials and responsible to such officials or to the general public." 29 C.F.R. § 1975.5(b)(2). In addressing this question, each side supports its position with different facts. The Society emphasizes its reliance on state funds to finance zoo operations, noting in particular that the Illinois legislature has authorized forest preserve district officials to levy taxes and issue bonds for the support of zoological parks. Ill.Rev.Stat. ch. 96½, ¶¶ 6444, 6445. In recent years the Society has received 50–60% of its revenue from tax funds raised by the District. Moreover, under its operation and maintenance agreement with the Society, the District maintains a significant amount of control over the Society's budget, including overseeing expenditures of nontax revenues the Society itself raises (primarily through admission and parking fees, concessions, souvenirs, and private donations). In addition to funding and budget considerations, the Society finds the following facts indicative of public control: (1) the zoo sits on District-owned land; (2) the zoo's security force is officially commissioned by state and local governments; (3) vehicles used on zoo premises are owned by the District and licensed as municipal vehicles; and (4) the District is named as a co-insured on all zoo insurance policies.

Acknowledging the Society's financial dependence on the District, the Secretary views the District's lack of direct control

---

1. Paragraph 4 of the 1926 agreement (also appearing as paragraph 3 in a superseding agreement of 1966) provides:

    The Society shall operate and maintain said Park and the buildings and other structures and enclosures in a reasonable and proper state of repair and maintain the same and the grounds within the Park in a clean and sanitary condition. The Society shall, at the expense of the District, select and provide all animals, equipment, materials and supplies necessary and proper to carry out the purposes of this agreement, and shall have entire control and management, of said Park and shall appoint, employ, direct, control, promote or remove all persons engaged in the management, care or operation of said Park, and shall fix and pay their respective salaries and compensations.

    Secretary's Exh. 5 at 96.

over zoo management, particularly with regard to personnel matters, as the controlling factor. Under its charter and by-laws, the Secretary points out, the Society is managed by a 35 member board of trustees. The trustees select the 240 governing members of the Society, who in turn elect the trustees. Of the 35 trustees only one— the president of the District board—is a public official. Of the 240 governing members only four are public officials. The trustees are responsible for developing zoo policies and electing officers, including the president, who oversees the day-to-day operations of the zoo. The District has no appointment and removal power and no direct role in the zoo's operation and maintenance.

The zoo's 240 workers are employed by the Society and are not treated as public employees. The Society, not the District, signs their paychecks and negotiates collective bargaining agreements with their union. They are not included in the pension or workers' compensation funds the state has established for its employees. Civil service rules do not apply to them. Further, the Society has treated itself as an employer subject to OSHA jurisdiction. In a March 1977 newsletter to its employees, the Society published an excerpt from the Secretary's handbook, *The Employee and OSHA* (1974), notifying employees of their rights and responsibilities under the Act.

■ We disagree with the Commission's conclusion that these competing versions of the facts weigh in favor of finding the Society to be a political subdivision. We note, first, that the Commission's determination is owed no special deference; it is the Secretary, not the Commission, who exercises policymaking and prosecutorial authority under the Act. 29 U.S.C. § 655; *cf. Potomac Electric Power Co. v. Director, OWCP*, 449 U.S. 268, 278 n. 18, 101

S.Ct. 509, 514 n. 18, 66 L.Ed.2d 446 (1980); *Peabody Coal Co. v. Blankenship*, 773 F.2d 173, 175 (7th Cir.1985). The Secretary's regulations, while recognizing that source of funds is one factor to be considered, indicate that it is not necessarily dispositive. Rather, "[e]ach case must be viewed on its merits; and whether a single factor will be decisive or whether the factors must be viewed in their relationship to each other as part of a sum total also depends on the merits of each case." 29 C.F.R. § 1975.5(d).[2] Under the circumstances of this case, we believe the decisive factors to be the Society's corporate structure, its resulting independence from direct District control over operations and maintenance, and the indisputably private nature of its employment relationships.

The Society's private, nonprofit corporate structure effectively insulates its officers from District control over management decisions. The officers, who handle the zoo's day-to-day operations, owe their positions to the trustees and, indirectly, to the governing members. Among these latter two groups the District enjoys only nominal representation. Over 97% of the trustees and over 98% of the governing members are private citizens unbeholden to the District or any other state agency. Considering in addition that the District possesses no power to appoint or remove the Society's managerial officers, those officers clearly do not owe the sort of "direct personal accountability to public officials or to the general public" that would entitle the Society to a political subdivision exemption. *Truman Medical Center*, 641 F.2d at 573 (nonprofit corporation held not a political subdivision where 18 of 49 directors were associated with state); *see also Jefferson County Community Center*, 732 F.2d at 125–26 (same holding where 7 of 15 directors appointed by state); *cf. Natural*

**2.** Other factors the Secretary may consider include whether the entity's administrators are appointed or removable by public officials; whether their salaries are paid from the government treasury; whether the entity earns a profit; whether the entity is financed by the government; whether it exercises governmental powers such as eminent domain; whether state, local, and federal laws including tax laws treat the entity as public; whether the entity's employees are regarded as or treated comparably to public employees; and whether their payroll is paid by the government. 29 C.F.R. § 1975.-5(c). The list contained in the regulations "is not exhaustive and no factor, isolated from the particular facts of a case, is assigned any particular weight." 29 C.F.R. § 1975.5(d).

*Gas Utility Dist.,* 402 U.S. at 608, 91 S.Ct. at 1751 (utility district held a political subdivision where all its commissioners were appointed and removable by state officials).

One aspect of zoo management in which the District plays no role whatsoever is in establishing the terms and conditions of employment for zoo workers. The District does not negotiate with employees or their union; it does not treat them as public employees for purposes of the state's workers' compensation or pension funds; it does not control zoo premises. The specific conditions which led to the issuing of an OSHA citation were wholly the Society's responsibility. Apparently, prior to the citation's issuance the Society considered itself an employer subject to OSHA jurisdiction.

These facts, we think, deserve special significance, for the OSH Act's immediate concern is with the employment relationship, at least insofar as the relationship involves considerations of safety and health. The political subdivision exemption represents an accommodation between the Act's general purpose of ensuring a safe workplace and the states' interest in preserving autonomy in their role as employers. *See Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 553 & n. 16, 105 S.Ct. 1005, 1019 & n. 16, 83 L.Ed.2d 1016 (1985); *Crestline Memorial Hospital Assoc. v. NLRB,* 668 F.2d 243, 245 n. 1 (6th Cir.1982). Exempting an entity that does not treat its employees as public employees would obstruct the Act's basic purpose without advancing the interests served by the exemption.

The Commission gave little weight to the structure of the Society and no weight at all to the non-public nature of the zoo employees' jobs. Instead, the Commission rested its decision primarily on the District's role in funding and overseeing the budget of the zoo. In the context of this case, we do not believe these factors should be decisive. The second branch of the Secretary's test is concerned with whether public officials *control* the employer's operations. Though the state provides slightly more than half of the District's operating revenues in the average year, nothing in the record suggests that the District uses its purse-string powers to usurp the Society's contractually-secured management powers. The Society need not, for example, obtain advance approval for individual expenditures incurred in operating the zoo. Absent direct evidence of control we are unwilling to infer that the Society's reliance on public funding has stripped it of its private nature. Fiscal accountability to a public agency does not convert a nonprofit corporation into an arm of government. *Austin Developmental Center,* 606 F.2d at 788, 789; *cf. Rendell-Baker v. Kohn,* 457 U.S. 830, 840–41, 102 S.Ct. 2764, 2770–71, 73 L.Ed.2d 418 (1982).

The other factors cited by the Society do not sway us. Neither the District's ownership of much of the zoo's real and personal property nor the fact that the Society's police officers are commissioned by state and local governments makes the Society ultimately answerable to the District.

For these reasons, we reverse the decision of the Commission and reinstate the citation and penalty.