LCEOC, INC., and Greater Hammond
Community Services, Inc.,
Appellants–Defendants,

v.

Patricia S. GREER, Administratrix
of the Estate Of Freddie Greer,
Deceased, Appellee–Plaintiff.

No. 45A03–9710–CV–356.

Court of Appeals of Indiana.

Sept. 23, 1998.

Robert J. Kopka, Lawrence M. Hansen, Gregory M. Bokota, Landau, Omahana & Kopka, Merrillville, for Appellants–Defendants.

David Paul Allen, Hammond, for Appellee–Plaintiff.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Defendants–Appellants Lake County Economic Opportunity Council ("LCEOC"), Greater Hammond Community Services, Inc. ("GHCS") and Bruce Lewis appeal from the denial of their motion for summary judgment following the complaint filed by Patricia Greer, Administratrix of the Estate of Freddie Greer, Deceased ("Greer").

We affirm and remand for further proceedings.

### ISSUE

This case presents the following issue: Whether community action agencies created under the Economic Opportunity Act of 1964 are entitled to immunity from liability under the Indiana Tort Claims Act ("the ITCA"), Ind.Code 34–4–16.5–1 *et seq.*

### FACTS AND PROCEDURAL HISTORY

This interlocutory appeal arises from a civil action for personal injury and wrongful death brought by Greer's estate against LCEOC, GHCS and GHCS's employee following an accident which resulted in Greer's death.

LCEOC is a private not-for-profit corporation that provides an array of social services to disadvantaged individuals and families in the six counties of Northwest Indiana. In order to fulfill its mandate of providing services to the citizens of such a large geographic region, LCEOC divided its service region into ten separate areas. LCEOC then designated a non-profit "community service corporation" for each of these ten areas. LCEOC contracts with its various community service corporations to carry out its mission of providing family services. LCEOC formed GHCS as the community service corporation to implement its policies in the cities of Hammond, Whiting, Munster, Highland and Northern Dyer.[1]

On May 3, 1994, Greer used the transportation services provided through GHCS. Bruce Lewis, the driver employed by GHCS, transported Greer to his doctor's appointment without incident. On the return trip however, Lewis lost his balance and dropped Greer while he was strapped into his wheelchair. In April of 1996, the Estate filed a wrongful death action and an alternative survival action against the Defendants. The Defendants denied all material allegations in their answer and raised several affirmative defenses including failure to comply with the notice requirements of the ITCA.

In February of 1997, the Defendants filed their motion for summary judgment alleging that LCEOC and GHCS were governmental

---

**1.** The record indicates that the corporate entity GHCS was administratively dissolved by the Indiana Secretary of State on September 12, 1994.

entities under the ITCA, and Greer's cause of action was therefore barred for failure to comply with the notice requirements under the ITCA. The Estate filed its response challenging both organizations' immunity status. Following a hearing, the trial court denied summary judgment finding that genuine issues of material fact existed as to whether LCEOC and GHCS were entitled to the protection of the ITCA. This interlocutory appeal followed.[2]

## DISCUSSION AND DECISION

### Standard of Review

The purpose of summary judgment is to end litigation about which no factual dispute exists and which may be determined as a matter of law. *Luider v. Skaggs*, 693 N.E.2d 593, 595 (Ind.Ct.App.1998). When reviewing a motion for summary judgment, we apply the same standard as the trial court, and we resolve all doubts in favor of the non-moving party. *Ebbinghouse v. FirstFleet, Inc.*, 693 N.E.2d 644, 646 (Ind.Ct.App.1998). Summary judgment is appropriate only if the designated evidentiary matter shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C).

### I. Community Action Agency as a Political Subdivision

■ Defendants contend that the trial court erred in denying summary judgment because the Estate failed to comply with the notice provisions of the ITCA. Specifically, Defendants contend that LCEOC is a "community action agency" and thus a "political subdivision" pursuant to the ITCA. Compliance with the ITCA is a procedural precedent which the Estate must prove and which the trial court must determine prior to trial. *Brunton v. Porter Memorial Hosp. Ambulance Service*, 647 N.E.2d 636, 639 (Ind.Ct. App.1994). Thus, compliance with the ITCA is not a question of fact for the jury but rather a legal determination to be made by

the court. *Lake County Juvenile Court v. Swanson*, 671 N.E.2d 429, 437 (Ind.Ct.App. 1996), *reh'g denied, trans. denied.*

### A. Statutory Authority

■ As this court has previously stated, the clear legislative intent of the ITCA is to set up a uniform body of law to govern the prosecution of tort claims against the State and other governmental entities. *Hasty v. Floyd Memorial Hosp.*, 612 N.E.2d 119, 121 (Ind.Ct.App.1992). Indiana Code 34–4–16.5–7 mandates that claims against "political subdivisions" are barred unless notice of the claim is filed with the governing body of the political subdivision and the Indiana political subdivision risk management commission within 180 days after the loss occurs.[3]

■ As defined by Ind.Code 34–4–16.5–2(c), a "governmental entity" is the state or a political subdivision of the state. Indiana Code 34–4–16.5–20 provides in pertinent part that "community action agencies" as defined in Ind.Code 12–14–23–2 "shall be treated as political subdivisions." Ind.Code 12–14–23–2 defines community action agency as follows:

As used in this chapter, 'community action agency' means an entity that meets the following conditions:

(1) Is any of the following:

(A) A political subdivision of the state.

(B) A combination of political subdivisions.

(C) An agency of a political subdivision.

(D) A private nonprofit agency.

(2) Has the authority under state or federal law to receive money and support the community action programs described in sections 3 and 4 of this chapter.

(3) Is designated as a community action agency by the governor or by federal law.

---

**2.** This court heard oral argument in Indianapolis on May 26, 1998.

**3.** Ind.Code 34–4–16.5–7(b) provides that "[a] claim against a political subdivision is not barred for failure to file notice with the Indiana political subdivision risk management commission creat-

ed under IC 27–1–29–5 if the political subdivision was not a member of the political subdivision risk management fund established under IC 27–1–29–10 at the time the act or omission took place."

### B. LCEOC's Immunity Status

In support of its status as a community action agency, LCEOC designated a letter from former Governor Evan Bayh recognizing the organization as the "Community Action Agency" for Jasper, Lake, Newton and Porter counties.[4] Additionally, Defendants designated the deposition testimony of Clifton Johnson, LCEOC's Vice–President of Administration. Johnson testified that LCEOC was a community action agency pursuant to statute. LCEOC also designated a pamphlet entitled "LCEOC, Inc.1965 to 1990: Celebrating 25 Years of Excellence." (R. 497). The first paragraph of this LCEOC literature explains the organization's formation as follows:

> LCEOC was established as a Community Action Agency by the Lake County Board of Commissioners in February, 1965. Community Action Agencies were created to implement the Economic Opportunity Act of 1964. Community Action Agencies, or "CAP's" as they were called, were the flagship of President Lyndon Johnson's Great Society programs.

(R. 498).

In denying summary judgment, the trial court stated that the Governor's letter did not "appear to be an official designation" in that it was not a public record nor was it certified under State seal. With regard to the LCEOC's private literature, the court opined that labeling itself as a community action agency did not equate with an official designation by the Governor. Hence, the trial court found that genuine issues of material fact remained on the issue of LCEOC's status under the ITCA. We disagree. While the trial court's findings illuminate its rationale, we do not rely upon such findings on appeal. *Mapleturn Utilities, Inc. v. Foxcliff South Associates, Inc.*, 673 N.E.2d 5, 10 (Ind.Ct.App.1996), *reh'g denied, trans. denied.* Rather than relying upon the specific

findings of fact and conclusions of law entered by the trial court, we base our decision solely upon the properly designated evidence. *Id.*

Title II of the Economic Opportunity Act of 1964 was passed to "stimulate a better focusing of all available local, State, private, and Federal resources upon the goal of enabling low-income families, and low-income individuals ... to become fully self-sufficient." Specifically, the Economic Opportunity Act "provides for community action agencies and programs, prescribes the structure and describes the functions of community action agencies and authorizes financial assistance to community action programs and related projects and activities." 42 U.S.C. § 2781(a). Under the statute, a community action agency is a "State or political subdivision of a State ... or a public or private nonprofit agency or organization which has been designated by a State or such a political subdivision ..." and which is "capable of planning, conducting, administering and evaluating a community action program ..." 42 U.S.C. · 2790(a). A community action program "includes or is designed to include ... a range of services and activities having a measurable and potentially major impact on causes of poverty in the community ..." *Id.*

LCEOC's Corporate History indicates that LCEOC is a private, not-for-profit corporation chartered by the State of Indiana in February of 1965. Indeed, LCEOC owes its beginnings to the Lake County Board of Commissioners. Article II of LCEOC's By-Laws detail the purposes and objectives of the corporation as follows:

> To stimulate a better focusing of all available Federal, State, local and private resources in such localities as in the opinion of the Board shall effectuate the purposes of the Corporation upon the goal of enabling low-income and disadvantaged families and individuals ... to attain the skills,

---

4. The letter was addressed to the Chairperson of LCEOC's Board of Directors and the Executive Director and provided as follows:

> In accordance with Public Law 100, Acts of 1982 (IC 12–1–21–1) your organization is recognized as the Community Action Agency of your area.
> Lake County Economic Opportunity Council

> Serving Jasper, Lake, Newton and Porter counties.
> Thank you for your efforts towards eliminating poverty and its causes in your area.

The letter is dated June 12, 1990, is on the Governor's letterhead and is signed by former Governor Bayh.

knowledge, and motivations and secure the opportunity needed for them to become fully self-sufficient . . .

(R. 191). We note that this language mirrors the language of Title II of the Economic Opportunity Act of 1964. LCEOC is also able to receive and administer private and public funds. In fact, the record indicates that LCEOC receives the majority of its funding from public sources pursuant to community action legislation.

In addition to the Governor's letter designating LCEOC as a community action agency, it is undisputed that LCEOC complies with the Title 12 legislation governing community action agencies in Indiana. For example, Indiana Code 12–14–23–6 provides that community action agencies shall establish a board consisting of not less than 15 and not more than 51 members. The composition of the board shall consist of one-third elected public officials, one-third chosen by democratic selection procedures to assure that the poor in the area are represented, and the remaining members to consist of members of business, industry, labor, welfare, education or other major community groups. A perusal of LCEOC's Corporate By–Laws shows that the agency is structured pursuant to the statutes governing community action agencies. LCEOC's programs are administered through a volunteer community action board consisting of between 15 and 51 members, and one-third of the board are elected public officials and one-third are democratically selected.

Based on the undisputed evidence, we find that LCEOC meets the criteria for a community action agency under Ind.Code 12–14–23–2 and therefore it is a political subdivision within the meaning of Ind.Code 34–4–16.5–20. Ind.Code 12–14–23–2 does not prescribe the method of designation required and we find that the Governor's letter clearly and unambiguously designates LCEOC as a community action agency. Thus, LCEOC is entitled to notice of tort claim pursuant to Ind. Code 34–4–16.5–7.

### C. Notice Under the ITCA

■ Notice under the ITCA must include the following information in a short and plain statement: (1) the circumstances which brought about the loss, (2) the extent of the loss, (3) the time and place the loss occurred, (4) the names of all persons involved, if known, (5) the amount of damages sought, and (6) the residence of the person making the claim at the time of the loss and at the time of filing the notice. Ind.Code 34–4–16.5–9. The purpose of the notice requirement is to provide the governmental entity the opportunity to investigate the facts surrounding an accident so that it may determine its liability and prepare a defense. *Hasty,* 612 N.E.2d at 123. Substantial compliance with the notice requirement may be sufficient, however, provided the purpose of the requirement is satisfied. *Id.* In order to constitute substantial compliance the notice must not only inform the governmental entity of the facts and circumstances of the alleged injury but must also advise of the injured party's intent to assert a tort claim. *Id.*

■ Our review of the record reveals several letters from the Estate to LCEOC detailing the accident and requesting contact from LCEOC's liability insurer. The first of these letters was dated only two weeks after Greer's accident. In the second letter, the Estate specifically stated that the letter was being written as a follow-up to "the notice given on May 17, 1994 of the personal injury claim . . . of May 3, 1994." (R. 134). Hence, the Estate's correspondence not only described the details of the accident but also advised LCEOC of the Estate's intent to assert a tort claim. We believe that the Estate's correspondence with LCEOC substantially complied with the ITCA's notice requirements.

### II. GHCS's Immunity Status

■ Having decided that LCEOC is a political subdivision within the meaning of the ITCA, we must determine whether GHCS is also entitled to immunity. It is undisputed that GHCS has not received the Governor's official community action agency designation. Hence, GHCS cannot come within the ambit of the ITCA via Ind.Code 34–4–16.5–20. However, Defendants argue that GHCS is an instrumentality of the State

and as such is entitled to protection under the ITCA. In support of this argument, Defendants rely on two Indiana cases.

The first case relied upon is *Ayres v. Indian Heights Volunteer Fire Dept.*, 493 N.E.2d 1229 (Ind 1986), wherein the Indiana Supreme Court held that a private not-for-profit volunteer fire department was entitled to the protection of the ITCA. Specifically, the court noted that "[w]hen private individuals or groups are endowed by the state with powers or functions governmental in nature, they become agencies or instrumentalities of the state and are subject to the laws and statutes affecting governmental agencies and corporations." *Id.* at 1235. The court compared volunteer fire departments with other independent contractors "in the business of paving streets, constructing school buildings or bridges, or many of the other private enterprises the government is sometimes called upon to hire to fulfill the governmental duties to the public." *Id.* The court then said that volunteer fire departments are not like independent contractors functioning as private businesses "available to anyone requiring their services, either public or private, and at a charge for their services." *Id.* The court concluded that because the volunteer fire department had contracted with the town trustee to provide services which were uniquely governmental in nature, the department had become an instrumentality of the local government, and thus was entitled to tort immunity. *Id.* Following the *Ayres* opinion, the Indiana legislature enacted Public Law 245–1987, wherein it stated that a volunteer fire company shall be treated as a "political subdivision." (codified at Ind.Code 34–4–16.5–20(a)(3)).

Defendants also rely on the decision rendered by this court in *World Productions, Inc. v. Capital Improvement Bd. of Managers of Marion County*, 514 N.E.2d 634 (Ind. Ct.App.1987), *reh'g denied, trans. denied*, wherein we classified the Capital Improvement Board ("CIB") as a governmental entity entitled to the protections of the ITCA. Specifically, in *World Productions* we were

deciding whether the CIB was a governmental entity and therefore exempt from punitive damages under the ITCA. In making this determination, we looked to the definition of "governmental entity" in the Act itself, and we were also guided by the test employed in the Seventh Circuit opinion *Brock v. Chicago Zoological Society*, 820 F.2d 909 (1987). The *Brock* court employed a two-part inquiry to decide whether the Chicago Zoological Society, which operates the Brookfield Zoo, was a governmental entity. Under the *Brock* test, "any entity that is '(1) created directly by the State, so as to constitute a department or administrative arm of the government, or (2) administered by individuals who are controlled by public officials and responsible to such officials or the general public' will be deemed to be a state or political subdivision...." 514 N.E.2d at 637 (citing *Brock*, 820 F.2d at 910). We found this test particularly instructive because the entities specifically enumerated as "political subdivisions under the ITCA are similarly either (1) created by the State as instrumentalities for performing government functions, or (2) administered by individuals who are controlled by public officials and responsible to such officials or the general public."

Employing the *Brock* test, we found that the CIB was accountable to public officials in that: Board members were appointed by the city and county; Board members could be removed for cause by statute; Board funds were handled as public funds; the Board's annual budget had to be approved by the city-county council; and the Board was subject to audit by the State Board of Accounts. Hence, we found sufficient public control so as to label the CIB as a governmental entity entitled to immunity from punitive damages.[5] *Id.* at 637.

Looking to the above cases for guidance, we must determine whether GHCS is in the business of providing services that are essentially governmental in nature. LCEOC's Corporate By–Laws indicate that there are ten community service corporations ("CSC's") under the jurisdiction of LCEOC. LCEOC distributes to these ten corpora-

---

**5.** Interestingly, while we labeled CIB as a governmental entity, we did not feel compelled to classify it as a particular political subdivision as enumerated in the ITCA. The defendants urge us

to likewise find that LCEOC and GHCS are governmental entities without assigning a particular political subdivision label.

tions, GHCS being one of them, grants it receives from federal, state and local sources. Affiliated CSC's corporate structures are required to mirror that of LCEOC. Hence, GHCS's programs are administered through a volunteer community action board that is comprised of one-third elected public officials; all funding and auditing of GHCS is done pursuant to LCEOC's corporate guidelines; GHCS's payroll is administered through LCEOC; and LCEOC files a consolidated audit for itself and all of its CSC's with the State Board of Accounts.[6]

In addition, LCEOC provides its CSC's with operational guidelines regarding personnel policies, purchasing procedures, accounting procedures, data collection and reporting procedures, audit procedures, board and advisory council structure and evaluation procedures. As part of its overseeing function, LCEOC's Board of Directors conducts an annual review of its CSC Board composition to maintain compliance. In the event of noncompliance, the LCEOC Board has the authority to withhold funds unless the appropriate corrective measures are taken. LCEOC and GHCS entered into a "Service Provider" Contract wherein GHCS specifically consented to LCEOC's regulatory measures. GHCS receives approximately 70% of its annual funding from LCEOC through the community action legislation. In short, GHCS operates pursuant to the directives of LCEOC. It receives its funding from LCEOC and is accountable to LCEOC.

LCEOC's community services include early childhood development services, elderly services and transportation services. In its mission statement, LCEOC describes its transportation service as "one of Northwest Indiana's major public transportation providers." (R. 221). In addition to providing that community action agencies shall be treated as political subdivisions, Ind.Code 34–4–16.5–20(a) also provides that the following shall be treated as such:

(2) An individual or corporation rendering public transportation services under a contract with a commuter transportation district created under IC 8–5–15.

Hence, the legislature has deemed certain public transportation providers entitled to political subdivision treatment.

Because GHCS is a provider of services governmental in nature, and because it is administered by LCEOC, which is subject to public control and audit, we find that GHCS is a governmental entity entitled to the protections of the Act. GHCS is a division of LCEOC and the Estate's substantial compliance with the notice requirements in its letters to LCEOC is sufficient to overcome summary judgment on GHCS's claim of lack of notice. Hence, this cause is remanded for further proceedings consistent with this opinion.

### CONCLUSION

Although we find that the trial court denied summary judgment for the wrong reasons, we nonetheless affirm its decision denying summary judgment. However, we remand for further proceedings consistent with this opinion.

Affirmed and remanded.

BAILEY and NAJAM, JJ., concur.

---

6. In 1994, LCEOC and GHCS filed consolidated audits with the State Board of Accounts. The record contains affidavit testimony from the office supervisor for the Not–For–Profit Division of the State Board of Accounts attesting to the fact that LCEOC and GHCS are subject to complete audit by the State Board of Accounts.