# Illinois Official Reports

## Supreme Court

*O'Toole v. Chicago Zoological Society*, 2015 IL 118254

| | |
|---|---|
| Caption in Supreme Court: | KRISTINE O'TOOLE, Appellee, v. THE CHICAGO ZOOLOGICAL SOCIETY, d/b/a Brookfield Zoo, Appellant. |
| Docket No. | 118254 |
| Filed | September 24, 2015 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. John P. Kirby, Judge, presiding. |
| Judgment | Appellate court judgment affirmed.<br>Cause remanded. |
| Counsel on Appeal | Michael Resis and Nick Kourvetaris, of SmithAmundsen LLC, of Chicago, for appellant.<br><br>William J. McMahon, of Hoey & Farina, P.C., of Chicago, and George Brugess, of Palos Heights, for appellee.<br><br>Lawrence J. Suffredin and J. Timothy Eaton, of Taft Stettinius & Hollister LLP, of Chicago, for *amici curiae* Lincoln Park Zoological Society *et al.*<br><br>Peter C. Nozicka, of Lucas & Cardenas, P.C., of Chicago, for *amicus curiae* Illinois Trial Lawyers Association. |

Justices          JUSTICE THEIS delivered the judgment of the court, with opinion.
Chief Justice Garman and Justices Freeman, Thomas, Kilbride, Karmeier, and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    The sole issue in this appeal is whether defendant Chicago Zoological Society (Society), doing business as Brookfield Zoo, is a "local public entity" under the Local Governmental and Governmental Employees Tort Immunity Act (Act) (745 ILCS 10/1-101 *et seq.* (West 2010)), so that the Act's one-year limitations period applied and time-barred plaintiff Kristine O'Toole's negligence complaint.

¶ 2    The trial court of Cook County concluded that the Society was a local public entity and that O'Toole's complaint was untimely. The appellate court reversed the trial court's decision and remanded for further proceedings. 2014 IL App (1st) 132652. For the reasons that follow, we affirm the appellate court's decision.

¶ 3                            BACKGROUND

¶ 4    In 2010, O'Toole tripped and fell on a paved pathway at Brookfield Zoo and sustained injuries. Almost two years later in 2012, she filed a single-count negligence complaint against the Society, alleging that it breached its duty to inspect and maintain the pathway, proximately causing her damages. In lieu of an answer, the Society filed a motion to dismiss under section 2-619 of the Code of Civil Procedure. 735 ILCS 5/2-619 (West 2010). The Society argued, *inter alia*, that the one-year limitations period of section 8-101(a) of the Tort Immunity Act (745 ILCS 10/8-101(a) (West 2010)), rather than the two-year limitations period of section 13-202 of the Code of Civil Procedure (735 ILCS 5/13-202 (West 2010)), applied and time-barred O'Toole's complaint. According to the Society, the Act's limitations period applied because the Society fell under the Act's definition of "[l]ocal public entity" as a "not-for-profit corporation organized for the purpose of conducting public business." 745 ILCS 10/1-206 (West 2010). The Society asserted that its public business was maintaining a zoo on land owned by the Forest Preserve District of Cook County (District), itself a local public entity.

¶ 5    In its motion to dismiss, the Society pointed to section 40 of the Cook County Forest Preserve District Act, which provides:

"§ 40. The corporate authorities of forest preserve districts, having the control or supervision of any forest preserves, may erect and maintain within such forest preserves, under the control or supervision of such corporate authorities, edifices to be used for the collection and display of animals as customary in zoological parks, and may collect and display such animals, or permit the directors or trustees of any zoological society devoted to the purposes aforesaid to erect and maintain a zoological park and to collect and display zoological collections within any forest preserve now or hereafter under the control or supervision of such forest preserve district, out of funds belonging to such zoological society, or to contract with the directors or trustees of any

- 2 -

zoological society on such terms and conditions as may to such corporate authorities seem best, relative to the erection, operation and maintenance of a zoological park and the collection and display of such animals within such forest preserve, out of the tax provided in Section 41.

Such forest preserve district may charge, or permit such zoological society to charge an admission fee. The proceeds of such admission fee shall be devoted exclusively to the operation and maintenance of such zoological park and the collections therein. All such zoological parks shall be open to the public without charge for a period equivalent to 52 days each year. All such zoological parks shall be open without charge to organized groups of children in attendance at schools in the State. The managing authority of the zoological park may limit the number of any such groups in any given day and may establish other rules and regulations that reasonably ensure public safety, accessibility, and convenience, including but not limited to standards of conduct and supervision. Charges may be made at any time for special services and for admission to special facilities within any zoological park for the education, entertainment or convenience of visitors." 70 ILCS 810/40 (West 2010).

Section 41 of the Forest Preserve District Act authorizes the corporate authorities of any forest preserve district to levy an annual tax upon property in the district to construct and maintain such a zoological park. The proceeds of that tax must be kept as a separate fund. 70 ILCS 810/41 (West 2010).

¶ 6 The Society also pointed to a 1986 agreement with the District, under which the Society would "maintain and operate" a zoo in Cook County "to collect and exhibit collections of animals and to promote the education and recreation of the people." In the agreement, the District agreed to "set apart" property for a zoo and levy and collect tax proceeds to support the zoo. The Society agreed to provide the animals and collections and devoting all its "funds, income and donations to the establishment, operation and development" of the zoo. The agreement continued:

"The Society shall operate and maintain [the zoo] and the buildings and other structures and enclosures, and all other property in [the zoo], and in doing so shall care for the animals and collections of animals and shall keep said buildings and structures in a reasonable and proper state of repair and maintain the same and the grounds within [the zoo] in a clean and sanitary condition. The Society shall, from funds budgeted by the District under [the agreement], select and provide all animals, equipment, materials and supplies necessary and proper to carry out the purposes of this agreement, and shall have entire control and management, of [the zoo], and its collections, and shall appoint, employ, direct, control, promote or remove all persons engaged in the management, care or operation of [the zoo], and shall fix and pay their respective salaries and compensations."

The Society, "by virtue of *** having the entire control and responsibility and management[,] as well as the operation and maintenance" of the zoo, was required to procure a liability insurance policy naming the District as an insured.

¶ 7 The Society also agreed to submit an annual audit and an annual itemized budget to the District. Under the agreement, the budget must be "passed upon by the Commissioners of the District," but any items in the budget that the commissioners do not expressly reject or modify

are considered approved. The Society, however, "need not obtain the approval of the District as *** to expenditures which it desires to make with monies derived from other sources than the District," and the Society can establish endowment and other funds from donations and bequests that it receives.

¶ 8        The agreement further provided that the District and its department heads would have access to the zoo at all times "for general police visitation and supervision, and for all other lawful purposes." Under the agreement, the Society could not mortgage, encumber, sell, or remove any of its property without the District's consent, and the Society could not cut down or remove any trees, except with the express authority of the District. Additionally, "All property purchased by the Society with funds provided by the *** District shall be the property of [the] District," but the Society could improve its collections through the exchange or sale of animals not needed for exhibition. It could also improve its collections using proceeds from concessions at the zoo, "with the approval of the District at such rates and for such time as it may deem best," and from parking fees set in the agreement. The agreement set entrance fees, as well, and stated that admission should be free one day per week, as required by statute, and "at all times for school groups."

¶ 9        The Society and the District agreed that the president of the District's board of commissioners would be an *ex officio* member of the Society's board of trustees, and the president would select three other members of the District's board to serve as *ex officio* governing members of the Society. In addition, the agreement provided that every 20 years, either party could choose to terminate the contractual relationship.

¶ 10       In her response to the Society's motion to dismiss, O'Toole argued that the Society was not a local public entity under the Act because it did not conduct public business. O'Toole relied upon the Society's response to her request to admit facts, in which the Society conceded that it was not a department or agency of any government; that it received less than half of its funding from tax proceeds; that its employees were not appointed or paid by the District and were not covered by any public pension or workers compensation funds; and that the vast majority of its trustees were not District officials. O'Toole also noted that the Society complies with the Occupational Safety and Health Act (OSHA), which does not apply to government employers. See 29 U.S.C. § 652(5) (Supp. IV 1998).

¶ 11       Following a hearing, the trial court granted the Society's motion to dismiss with prejudice.[1] O'Toole appealed.

¶ 12       The appellate court reversed and remanded for further proceedings. 2014 IL App (1st) 132652. The appellate court noted that the term "local public entity" in section 1-206 includes both governmental bodies and certain not-for-profit corporations. *Id.* ¶ 13. The court then reviewed *Carroll v. Paddock*, 199 Ill. 2d 16 (2002), *Brugger v. Joseph Academy, Inc.*, 202 Ill. 2d 435 (2002), and *Hubble v. Bi-State Development Agency of the Illinois-Missouri Metropolitan District*, 238 Ill. 2d 262 (2010), where this court interpreted that section to

---

[1]In its motion to dismiss, the Society also argued that section 3-106 of the Tort Immunity Act (745 ILCS 10/3-106 (West 2010)) provided immunity. The transcript from the hearing on that motion does not appear in the record before us, and the handwritten order by O'Toole's trial attorneys does not explain the court's reasoning. The parties seem to agree that the court dismissed the complaint as untimely under section 8-101(a) of the Act. Thus, the substantive immunity issue is not before us in this appeal.

require that a not-for-profit corporation must conduct public business in order for the Tort Immunity Act to apply to its activities. 2014 IL App (1st) 132652, ¶¶ 14-19. The appellate court recognized a distinction between public business and public interest, stating, "While the 1986 agreement stated that defendant [Society] was organized to operate a zoo for the instruction and recreation of the public, the zoo's furtherance of the public's interest is not synonymous with conducting public business within the meaning of the Tort Immunity Act." *Id.* ¶ 20. According to the appellate court, a key inquiry is control, because a not-for-profit corporation does not conduct public business absent evidence of local government control. *Id.* ¶ 15 (citing *Carroll*, 199 Ill. 2d at 26).

¶ 13   The appellate court concluded that the Society had not demonstrated that its activities were controlled by the District. 2014 IL App (1st) 132652, ¶ 22. The court noted that, pursuant to the Forest Preserve District Act, the District delegated control of the zoo's daily operations, including all maintenance and personnel decisions, to the Society. *Id.* The court further noted that only four members of the District's board sat on the Society's board or served among its governing members; 90% of the Society's leadership was not employed by the District. *Id.* ¶ 23. The court highlighted the fact that less than half of the Society's funding derived from the taxes levied and collected by the District. *Id.* ¶ 24. And the Society was not subject to regulations typical of governmental units, like those concerning public pensions and workers' compensation benefits, but was subject to OSHA. *Id.* ¶ 25. While the District has "some limited oversight" over the Society, that did not amount to the control contemplated by the term public business. *Id.* ¶ 28.

¶ 14   We granted the Society's petition for leave to appeal. See Ill. S. Ct. R. 315(a) (eff. Jan. 1, 2015). We also allowed the District, the Chicago Park District, the Lincoln Park Zoological Society, and the Chicago Horticultural Society to file an *amicus curiae* brief in support of the Society, and we allowed the Illinois Trial Lawyers Association to file an *amicus curiae* brief in support of O'Toole. See Ill. S. Ct. R. 345(a) (eff. Sept. 20, 2010).

¶ 15                                    ANALYSIS

¶ 16   Our review of a dismissal under section 2-619(a)(5) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(5) (West 2008)) for failure to file a claim within the applicable statute of limitations is *de novo*. *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 254 (2004). Here, the parties' positions are clear. O'Toole argues that the Society is not a local public entity under section 1-206 of the Tort Immunity Act, so the one-year limitations period of section 8-101(a) of that Act did not apply and time-bar her complaint. The Society argues that it is a local public entity, and the Act's one-year limitations period applied.

¶ 17   Section 1-206 provides:
          "§ 1-206. 'Local public entity' includes a county, township, municipality, municipal corporation, school district, school board, educational service region, regional board of school trustees, trustees of schools of townships, treasurers of schools of townships, community college district, community college board, forest preserve district, park district, fire protection district, sanitary district, museum district, emergency telephone system board, and all other local governmental bodies. 'Local public entity' also includes library systems and any intergovernmental agency or similar entity formed pursuant to the Constitution of the State of Illinois or the

Intergovernmental Cooperation Act *as well as any not-for-profit corporation organized for the purpose of conducting public business*." (Emphasis added.) 745 ILCS 10/1-206 (West 2012).

Thus, section 1-206 defines the term "local public entity" broadly with an extensive list of such entities. See *Hubble*, 238 Ill. 2d at 269. That list includes some not-for-profit corporations—namely, those that perform "public business."

¶ 18    We interpreted the term "public business" definitively in *Carroll* and applied that definition in *Brugger*, and those cases guide our analysis here. In *Carroll*, the plaintiff brought his son to a not-for-profit community hospital, after he attempted suicide. The son was discharged that day, and the plaintiff took him to a not-for-profit mental health center the next day. The son committed suicide at the center. Two years later, the plaintiff filed a wrongful death complaint against the hospital and center. The hospital and the center filed motions to dismiss under section 2-619(a)(5), contending that they were "local public entities" under section 1-206 of the Act, and, consequently, the plaintiff's complaint was untimely under section 8-101(a). The trial court granted those motions and dismissed the complaint. The plaintiff appealed, and the appellate court reversed and remanded. The appellate court held that public funding is a determinative factor in deciding whether a not-for-profit corporation falls under the Act's definition. Because the hospital and the center were not "almost entirely government funded," they were not local public entities, and the Act's limitations period did not apply. *Carroll v. Paddock*, 317 Ill. App. 3d 985, 994-95 (2000).

¶ 19    This court affirmed, stating that the appellate court placed too much emphasis on government funding, and not enough emphasis on "public business," the focus of the statutory language. *Carroll*, 199 Ill. 2d at 25. We discussed the hospital and the center, and identified some relevant factors for deciding if a not-for-profit corporation is also a local public entity. No factor is more important than control: "Without evidence of local governmental control, it cannot be said that a not-for-profit corporation conducts 'public business' ***." *Id.* at 26. Indicative of such control would be evidence that the entity remains subject to state statutes, such as the Open Meetings Act (5 ILCS 120/1.01 *et seq.* (West 2010)) and the Freedom of Information Act (5 ILCS 140/1 *et seq.* (West 2010)), with which governmental units must comply, or even "local ordinances that dictate the means and methods to be used by the not-for-profit corporation in conducting its business." *Carroll*, 199 Ill. 2d at 26-27. Evidence that members of the county board or another governing body control the corporation would also be relevant in this regard. *Id.* at 27. We summarized:

> "Public business is the business of government and a local public entity must either be owned by or operated and controlled by a local governmental unit. Immunity under the Act only attaches to liability arising from the operation of government. 745 ILCS 10/1–101.1 (West 2000). Therefore, a not-for-profit is involved in the operation of the government's public business if and only if the not-for-profit is tightly enmeshed with government either through direct governmental ownership or operational control by a unit of local government." *Id.*

¶ 20    Nine months later, we decided *Brugger*, strongly reaffirming *Carroll*. In *Brugger*, a student was injured during physical education class at a not-for-profit private academy, which provided services for emotionally handicapped youth. The student filed a personal injury complaint against the academy and the district, alleging willful and wanton misconduct by the

academy and the district. The academy eventually filed a motion for summary judgment, contending that it was a local public entity under section 1-206 of the Act and, therefore, entitled to the immunity offered by section 3-108(a). 745 ILCS 10/3-108(a) (West 2010). The trial court granted the academy's motion. The student appealed, and the appellate court reversed and remanded.

¶ 21    This court again affirmed, finding no merit in the academy's arguments that *Carroll* was wrongly decided. Indeed, we backed both "our method of construction in *Carroll* and our interpretation of section 1-206." *Brugger*, 202 Ill. 2d at 445. We repeated our holding in that case:

>        "[A]ny not-for-profit corporation seeking tort immunity under that section must demonstrate that it conducts 'public business' by establishing that it pursues 'an activity that benefits the entire community without limitation' [citation] and that it is 'tightly enmeshed with government either through direct governmental ownership or operational control by a unit of local government.' " (Internal quotation marks omitted.) *Id.* (quoting *Carroll*, 199 Ill. 2d at 25-26, 27).

¶ 22    Regarding the academy, we determined that it was not tightly enmeshed with government because it was not controlled by a unit of local government. First, though extensive state and local regulation accompanied its contracts with public school districts, the academy was bound by such regulation only because it chose to do business with those districts. *Brugger*, 202 Ill. 2d at 447. It could escape regulation if it avoided those contracts: "Truly *public* school facilities do not have this option." (Emphasis in original.) *Id.* at 448. Second, and more importantly, the academy never ceded "operational control" to the public school districts and maintained autonomy in its daily work, free from government decisionmaking. *Id.* at 447. The academy's board was comprised solely of members acting in their individual capacities, and "[n]o governmental entity or public official acting in an official capacity is represented on the board." *Id.* at 447-48. Finally, the court addressed funding, and concluded that money received by the academy was "simply revenue obtained from tuition payments made by the contracting public schools," not direct payments from the state budget. *Id.* at 448.

¶ 23    Our case law unmistakably links section 1-206 of the Act, which contains the term "public business," with section 1-101.1 of the Act, which states that the Tort Immunity Act's overarching purpose is to shield local public entities and their employees from liability arising out of "the operation of government." 745 ILCS 10/1-101.1 (West 2012); see *Carroll*, 199 Ill. 2d at 27. A not-for-profit corporation only conducts the operation of the government's public business if it is controlled by the government. *Id.* at 26. Stated differently, the key inquiry in cases like this is whether the not-for-profit corporation seeking tort immunity remains subject to " 'operational control by a unit of local government.' " See *Brugger*, 202 Ill. 2d at 447 (quoting *Carroll*, 199 Ill. 2d at 27). With this understanding, we turn to the facts of this case.

¶ 24    The District maintains control over the real property under the zoo, while the District and the Society share control over the other property of the zoo. Under the agreement, the District must authorize the Society to sell, remove, or encumber any of the zoo's buildings, enclosures, trees, or animals. In addition, the agreement allows the District to access the zoo at all times for general police visitation and supervision.

¶ 25    Other provisions in the agreement, however, indicate that the Society controls the daily operations of the zoo. The agreement allows the Society to maintain and operate a zoo, and

instructs it to devote its funding to the operation and development of a zoo. Under the agreement, the Society "shall operate and maintain" the zoo, its buildings, and other property in a proper state of repair and in a clean and sanitary condition. The Society "shall have entire control and management" of the zoo, and "shall appoint, employ, direct, control, promote or remove all persons engaged in the management, care or operation" of the zoo. Those persons are employees of the Society, and they do not participate in public pension or workers' compensation funds. And because the Society has "entire control" of the zoo, it must obtain liability insurance to protect the District. Ceding such broad operational control to the Society is consistent with section 40 of the Forest Preserve District Act, which authorizes the District either to permit the leaders of a zoological society to erect and maintain a zoo on District property funded by the society, or to contract with the leaders of a zoological society to erect, maintain, and operate a zoo on District property funded by tax revenues. See 70 ILCS 810/40 (West 2010).

¶ 26 All property purchased with tax revenues belongs to the District, but, as the Society conceded below, taxes provide less than half the zoo's funds. Presumably, the remaining funds come from a combination of sources—admission fees, as set in the agreement, concessions, as approved by the District, and donations and bequests, which the Society uses solely for its own purposes. Under the agreement, the District does have a financial oversight role. The Society must submit to annual audits, and submit annual budgets to the District. However, the District does not approve those budgets, and instead "pass[es] upon" them, and any items not expressly rejected are considered approved. Additionally, the president of the District's board of commissioners is a member of the Society's board of trustees, and three other members of the District's board serve as governing members of the Society. Those positions are *ex officio*, and 90% of the Society's governing members are not District board members.

¶ 27 The parties do not discuss whether the Society is governed by state statutes like the Open Meetings Act and the Freedom of Information Act, or any local ordinances, but O'Toole notes that the Society complies with OSHA, which does not apply to government employers. OSHA compliance was the issue in *Brock v. Chicago Zoological Society*, 820 F.2d 909 (7th Cir. 1987). There, the federal Occupational Safety and Health Review Commission concluded that the Society was exempt under OSHA as "a political subdivision" of Illinois. The Circuit Court of Appeals reversed that decision. Although its analysis under federal law differed in some respects from our analysis under the Tort Immunity Act, there are notable parallels.

¶ 28 Pursuant to OSHA, the Secretary of Labor uses a two-part test to determine whether an entity is a political subdivision of a State and, therefore, exempt from regulation. First, the entity must be created by the State, so as to constitute a department or administrative arm of the government. Second, the entity must be administered by individuals who are controlled by public officials and responsible to those officials, not the public. Both parts of that test parallel the operational control prong of *Carroll*. In *Brock*, the appeals court held that "[t]hough state officials were instrumental in the founding of the Society, they deliberately designed it as a private entity to be operated independently of the District and other state agencies." *Id.* at 911. The court further held that, although the Society was financially dependent on the District, the District lacked "direct control over zoo management, particularly with regard to personnel matters." *Id.* at 911-12. That is, "[t]he District has no appointment and removal power and no direct role in the zoo's operation and maintenance." *Id.* at 912. The appeals court even addressed the Society's status as a not-for-profit corporation:

"The Society's private, nonprofit corporate structure effectively insulates its officers from District control over management decisions. The officers, who handle the zoo's day-to-day operations, owe their positions to the trustees and, indirectly, to the governing members. Among these latter two groups the District enjoys only nominal representation. Over 97% of the trustees and over 98% of the governing members are private citizens unbeholden to the District or any other state agency." *Id.*

¶ 29 The appeals court noted that the District exercises no control over the terms and conditions of employment for zoo employees. *Id.* at 913. The District does not negotiate with the employees or their union, and it does not treat them as public employees. *Id.* More importantly, "it does not control zoo premises." *Id.* As the *Brock* court noted, the conditions which led to an OSHA citation were wholly the Society's responsibility. *Id.* And like that court, we can find nothing to suggest that the District has used its purse-string powers to usurp the Society's "contractually-secured" control over zoo management. *Id.* "Absent direct evidence of control we are unwilling to infer that the Society's reliance on public funding has stripped it of its private nature." *Id.*

¶ 30 We hold that the District does not exercise operational control over the Society, so the Society is not a local public entity under section 1-206 of the Act and the one-year limitations period of section 8-101(a) did not apply and time-bar O'Toole's complaint.

¶ 31                                                    CONCLUSION

¶ 32 For the reasons that we have stated, we affirm the decision of the appellate court and remand for further proceedings.

¶ 33 Appellate court judgment affirmed.

¶ 34 Cause remanded.