JEFFERSON COUNTY COMMUNITY
CENTER FOR DEVELOPMENTAL
DISABILITIES, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 81–2338, 82–2052.

United States Court of Appeals,
Tenth Circuit.

April 16, 1984.

Lawrence W. Marquess of Bradley, Campbell & Carney, Golden, Colo., for petitioner.

Helen Morgan, Atty., N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen., Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., with her on brief), for respondent.

Before McWILLIAMS, LOGAN and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

The Jefferson County Community Center for Developmental Disabilities, Inc. (the Center) petitions this court to review and set aside two orders of the National Labor Relations Board (NLRB or the Board) requiring the Center to bargain with and supply information to the Community Center Professional Employees Association (the Association). The Board has cross-applied for enforcement of both orders. On appeal, the Center raises a number of challenges to the Board's jurisdiction and attacks the conduct of the representation election. Principally, the Center contends that it is a political subdivision of the state of Colorado and therefore is exempt from NLRB jurisdiction under section 2(2) of the National Labor Relations Act, 29 U.S.C. § 152(2) (1982) (the Act). We find the Center's arguments unpersuasive and accordingly grant enforcement of the Board's orders.

I.

The Center is a nonprofit Colorado corporation established in 1964 to provide a variety of educational and vocational services for mentally retarded and seriously handicapped individuals. As an alternative to institutionalization, it offers these services pursuant to a "community-centered program" enacted by the Colorado General Assembly to assist the handicapped and retarded. *See* Colo.Rev.Stat. §§ 27–11–101 to –106 (1973). The Center operates two schools, three sheltered workshops, and nine residential facilities in a four-county area in Colorado.

In February 1980, the Association filed a petition with the NLRB, seeking certification as the collective bargaining representative of a unit of professional and technical employees at the Center. Following three days of hearings, the NLRB Regional Director rejected the Center's contention that it was exempt from the Board's jurisdiction and directed a representation election. He found that the Center was not a political subdivision within the meaning of section 2(2) of the Act, and that it retained sufficient control over its labor relations to bargain effectively. Because certain categories of employees included in the bargaining unit were professionals, the Regional Director established two voting groups— one of professional employees and one of nonprofessionals. He directed the professionals to vote first on whether they wished to be included in a single bargaining unit with the nonprofessionals. *See* 29 U.S.C. § 159(b)(1) (1982). Both groups were then to vote on the representation question.

The election was held in August 1980 with the professional employees voting 37 to 12 in favor of inclusion with the nonprofessionals. This combined unit voted by a slim margin to be represented by the Association, but the Center challenged a number of ballots and objected to the conduct of the election. The Board sustained several of the Center's challenges and objections and directed a second election. The new election was held in May 1981. This time

the professional employees voted not to be included in a single unit with the nonprofessionals. The professionals then voted 53 to 19 in favor of representation by the Association. The nonprofessional unit voted against representation by a margin of 55 to 17. The Center again objected to the election, arguing that the inclusion question had already been decided and should not have been redetermined in the second election. The Acting Regional Director overruled the Center's objection and certified the Association as the professional employees' collective bargaining representative. The Center's subsequent request for review by the Board was denied.

In June 1981, acting upon a charge brought by the Association, the Regional Director issued a complaint alleging that the Center had violated sections 8(a)(5) and (1) of the Act by refusing to bargain with the Association. The Center's answer admitted its refusal to bargain and raised as a defense its objection to the Board's jurisdiction. The Board granted the General Counsel's motion for summary judgment and ordered the Center to bargain with the Association. This appeal followed.[1]

## II.

■ Section 2(2) of the Act provides that "[t]he term 'employer' ... shall not include ... any State or political subdivision thereof ...." 29 U.S.C. § 152(2). Although the term "political subdivision" is not defined in the Act or its legislative history, the Board has long limited the exemption to entities "that are either (1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate." *NLRB v. Natural Gas Utility District*, 402 U.S. 600, 604–05, 91 S.Ct. 1746, 1749–1750, 29 L.Ed.2d 206 (1971); *Board of Trustees of*

*Memorial Hospital v. NLRB*, 624 F.2d 177, 184 (10th Cir.1980). In the instant case, the Board accepted the Regional Director's finding that the Center did not qualify as a political subdivision under either alternative of this test. We agree.

■ The Board has initial responsibility for determining who is an employer for purposes of the Act, *NLRB v. E.C. Atkins & Co.*, 331 U.S. 398, 403, 67 S.Ct. 1265, 1268, 91 L.Ed. 1563 (1947); *Museum Associates v. NLRB*, 688 F.2d 1278, 1280 (9th Cir.1982); *NLRB v. Pope Maintenance Corp.*, 573 F.2d 898, 902 (5th Cir.1978), and its construction of its own statutory jurisdiction is entitled to great respect, *Natural Gas Utility District*, 402 U.S. at 605, 91 S.Ct. at 1749; *NLRB v. Austin Developmental Center, Inc.*, 606 F.2d 785, 789 (7th Cir.1979). We must accept the Board's determination "if it has a reasonable basis in the evidence and is not inconsistent with the law." *Atkins*, 331 U.S. at 403, 67 S.Ct. at 1268; *Museum Associates*, 688 F.2d at 1280.

Turning to the first part of the test, it is evident that the Center was not created directly by the state of Colorado as a department or administrative arm of government. The record shows that the Center was organized by a group of individuals as a nonprofit corporation under applicable Colorado laws. No special legislative act brought it into existence. *Compare Natural Gas Utility District*, 402 U.S. at 605–06, 91 S.Ct. at 1749–50 (utility district organized under special law requiring finding of public necessity for creation of district); *Crilly v. Southeastern Pennsylvania Transportation Authority*, 529 F.2d 1355, 1358 (3d Cir.1976) (transportation authority created by act of legislature as agency and instrumentality of commonwealth), *with Truman Medical Center, Inc. v. NLRB*,

1. In March 1982, the Association commenced additional unfair labor practice proceedings based upon the Center's refusal to supply certain relevant information pending this court's consideration of the validity of the certification. The Board found that this conduct also violated sections 8(a)(5) and (1) of the Act, and ordered the Center to supply the requested information. We subsequently granted the Center's motion to consolidate the two actions for purposes of this appeal. The Center raises identical issues in both appeals.

641 F.2d 570, 572 (8th Cir.1981) (medical center organized under Missouri not-for-profit corporation law); *NLRB v. Highview, Inc.*, 590 F.2d 174, 176 (5th Cir.) (nursing home incorporated by private individuals as nonprofit corporation under Georgia law), *modified on other grounds*, 595 F.2d 339 (1979); *NLRB v. Natchez Trace Electric Power Association*, 476 F.2d 1042, 1044–45 (5th Cir.1973) (electric power association organized by private citizens as nonprofit corporation under Mississippi law).

The record contains no indication that the Center is or was intended to be a department or administrative arm of the state government. It is instead one of some twenty-two community center corporations with which the state department of institutions and other governmental units contract for the purchase of services for the mentally retarded and seriously handicapped. Although the Center may function as an integrated part of a legislative scheme to provide such services, *see* Colo. Rev.Stat. §§ 27–11–101 to –106 (1973),[2] it does so not as a state-created department or administrative arm of government, but essentially as a private contractor. *Cf. Truman Medical Center*, 641 F.2d at 572 (medical center assumed responsibility of city and county for medical care of indigents pursuant to series of contracts, not statutory duty).

The Center fares no better under the second branch of the Board's test, as the record contains no evidence that it is "administered by individuals who are responsible to public officials or to the general electorate." *Natural Gas Utility District*, 402 U.S. at 604–05, 91 S.Ct. at 1749. Management of the Center is vested in a fifteen-member Board of Directors. The corporation's by-laws require that eight members be appointed annually by certain designated organizations, seven of which are public agencies.[3] The remaining members are elected by the membership of the cor-

**2.** The relevant legislation establishes a "community-centered program" to offer services for the mentally retarded and seriously handicapped, Colo.Rev.Stat. § 27–11–101 (1973), and authorizes the state department of institutions and other governmental units to purchase such services "through community incorporated boards or accredited nonprofit sheltered workshops which have been approved by the department of institutions," *id.* § –103(1)(b). The community boards are in turn authorized to purchase these services from approved public or private facilities in the community. If none are available, the board may develop and operate the services directly. *Id.*

As a community board directly furnishing services for the developmentally disabled, the Center plainly functions within the statutory scheme set out above. It is equally evident, however, that this legislation did not "create" the Center or in any way establish it as a department or administrative arm of the state. Even if, as the Center contends, it was created "pursuant" to this legislation and functions as an integrated part of the legislative program, these factors do not qualify the Center as a "political subdivision" for purposes of § 2(2) of the Act.

**3.** The parties disagree as to whether the eighth appointed organization, the Jefferson County Association for Retarded Citizens, is a public agency for purposes of this test. The Center contends that the County Association, a voluntary nonprofit organization that monitors and reviews programs for the handicapped, is a public agency and that all of the appointive directors, a majority of the Board, are therefore appointed by government entities. Based on the record of the representation hearing, however, there is substantial evidence to support the Board's conclusion that the Association is not in fact a public agency but is merely the local branch of an independent national organization of citizens concerned with the problems of the handicapped. Although the group receives some governmental funding and its programs are subject to partial review by the state, there is no indication in the record that the County Association was created by statute or that it is in any sense an arm of government.

Even if we were persuaded that the County Association is a public agency, however, this would not alter our conclusion that the Center is not administered by individuals responsible to public officials or the general electorate. The composition of the Center's Board of Directors is established not by statute but by the by-laws of the corporation, which are subject to amendment by a two-thirds vote of the Board. Thus, to the extent the Directors are accountable to public officials, they are so accountable by choice rather than by law. Such an arrangement does not qualify the Center as a political subdivision under the Board's second test. *See Crestline Memorial Hospital Association, Inc. v. NLRB*, 668 F.2d 243, 245 (6th Cir.1982).

poration.[4] Appointed directors may be removed at any time by a majority vote of the Board; elected directors may be removed by a majority of the corporation membership.

The record thus demonstrates that although seven directors are appointed by public agencies under the Center's by-laws, a majority of the Board is neither appointed by nor subject to removal by public officials or the general electrate and has no official connection to any governmental body. Under these circumstances, the Center is not administered by individuals who are accountable to public officials or the general electorate. *Cf. Truman Medical Center, Inc.,* 641 F.2d at 573 (medical center held not political subdivision where 31 of 49 directors neither appointed by nor subject to removal by public officials or general public).

The Center also lacks a number of other attributes commonly associated with political subdivisions, including the powers of taxation, subpoena, and eminent domain, and the authority to issue tax-exempt bonds. *See, e.g., Natural Gas Utility District,* 402 U.S. at 606–09, 91 S.Ct. at 1750–51; *Truman Medical Center,* 641 F.2d at 572; *Austin Developmental Center,* 606 F.2d at 789; *Highview,* 590 F.2d at 176–77. Furthermore, the Center is not declared by statute to be a municipality, public corporation, or other such entity, *cf. Natural Gas Utility District,* 402 U.S. at 606, 91 S.Ct. at 1750, and its employees are not covered by the state's public employee retirement program. In view of all the foregoing, we hold that the Center is not a "political subdivision" within the meaning of section 2(2) of the Act.

**4.** Members of the corporation include men and women over the age of eighteen residing in the relevant area, employees of an agency within the area that services developmentally disabled people, and "any interested person who qualifies" and so notifies the Center's Board Secretary.

**5.** The Center also contends that it should be exempted from NLRB jurisdiction because it is an adjunct of the Colorado public school system. Although the Board has recently repudiated the "adjunct test," *see Wordsworth Academy,*

### III.

The Center argues that even if not a political subdivision of the state, it is subject to such extensive control by governmental agencies that it is entitled to share the state's section 2(2) exemption. Alternatively, the Center maintains that the Board abused its discretion in asserting jurisdiction because the Center lacks sufficient control over its terms and conditions of employment to be capable of effective bargaining.[5] While these are two separate arguments—one pertaining to the Board's statutory jurisdiction, the other to its discretionary exercise of that jurisdiction—the tests are essentially the same. *Compare Austin Developmental Center, Inc.,* 606 F.2d at 789, *with NLRB v. St. Louis Comprehensive Neighborhood Health Center, Inc.,* 633 F.2d 1268, 1270 (8th Cir.1980), *cert. denied,* 454 U.S. 819, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981). We must determine whether the Center "retain[s] sufficient control over the employment relationship to engage in meaningful collective bargaining." *Board of Trustees of Memorial Hospital,* 624 F.2d at 185; *see also R.W. Harmon & Sons, Inc. v. NLRB,* 664 F.2d 248, 251 (10th Cir.1981).

The record establishes that the Center's primary source of income is derived from contracts with and grants from governmental agencies. Pursuant to these funding agreements, the Center is subject to a multitude of government-imposed restrictions and regulations which, it claims, deprive it of sufficient control over its employment relationships to bargain effectively. These include administrative and procedural regu-

262 N.L.R.B. No. 42 (1982), the Center maintains that the test was still viable at the time this case was before the Board and that it should have been applied. However, the Center did not argue its adjunct status to the Board or the Regional Director during the representation proceedings below. Having failed to raise the issue at that time, the Center is precluded from raising it on this appeal. *R.W. Harmon & Sons, Inc. v. NLRB,* 664 F.2d 248, 252 (10th Cir.1981); *see* 29 U.S.C. § 160(e) (1982).

lations, budget ceilings and restraints, review and oversight of the Center's programs, and a host of standards, guidelines, and specifications directed primarily to the quality of client care provided by the Center, such as staff certification and licensing requirements, mandatory job classifications, program content and eligibility restrictions, and physical plant specifications.

The Center concedes, however, that its Board of Directors has final decision-making authority over the essential terms and conditions of employment, including "wages, fringe benefits, hiring, firing, staffing, personnel policies, final determination of grievances, and virtually every other aspect of labor relations." Brief of Petitioner at 42. These are the "most important incidents of the employer-employee relationship," *Atkins,* 331 U.S. at 413, 67 S.Ct. at 1273, and they comprise the "bread and butter issues of collective bargaining," *Harmon,* 664 F.2d at 251.

 While we do not doubt that the Center's extensive dealings with governmental agencies impede somewhat its ability to bargain with a union, "no employer enjoys total freedom in this regard." *Pope Maintenance Corp.,* 573 F.2d at 904. The Center's position is not substantially distinguishable from that of government contractors generally or, indeed, that of any employer who provides services pursuant to a detailed performance contract. *See, e.g., Denver Post of the National Society of the Volunteers of America v. NLRB,* 732 F.2d 769, —— (10th Cir.1984); *Harmon,* 664 F.2d at 250–51; *Austin Developmental Center,* 606 F.2d at 787–90. In any event, the jurisdictional test does not require that an employer control all terms and conditions of employment, but only that he retain enough control to bargain effectively. *Harmon,* 664 F.2d at 251. Here, it is undisputed that the Center substantially controls the "basic bargaining subjects," including wages, benefits, hiring, firing, promotion, discipline, and grievances. *See id.* It is therefore capable of

effective bargaining. Under the circumstances, the Board's exercise of jurisdiction was appropriate.

### IV.

■ Finally, the Center alleges that the Board abused its discretion in allowing the professional employees to vote twice on whether to be included with nonprofessionals in a single bargaining unit. We do not agree. Section 9(b)(1) of the Act precludes the Board from placing professional and nonprofessional employees in a single bargaining unit unless a majority of the professionals have consented to such a unit. *See* 29 U.S.C. § 159(b)(1) (1982).[6] Although the professionals did so consent in the first election, the rerun election was not held until nine months later. In view of this substantial time lag, it was not unreasonable for the Board to conduct a new vote on the inclusion issue in order to take into account any turnover among the professional employees that may have occurred during the interim. We see no abuse of discretion.

For the reasons set forth above, the Board's orders in these consolidated actions are enforced.

---

**6.** Section 9(b)(1) of the Act provides that the Board shall not find any unit appropriate for collective bargaining purposes "if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit ...." 29 U.S.C. § 159(b)(1) (1982).