IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 11, 2008

Charles R. Fulbruge III
Clerk

No. 06-61032

STARTRAN, INC.

Petitioner

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION;
ELAINE CHAO, SECRETARY, DEPARTMENT OF LABOR

Respondents

Petition for Review of an Order of the
Occupational Safety and Health Review Commission
(02-1140)

Before GARWOOD, GARZA, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

Petitioner StarTran, Inc. (StarTran) appeals the decision of the Occupational Safety and Health Review Commission (the Commission) holding that it does not qualify for the political subdivision exemption from the Occupational Safety and Health Act (the OSH Act), 29 U.S.C. § 652(5) and, as a result, must comply with a citation and penalty issued against it. Section 652(5) provides that "[t]he term 'employer' . . . does not include . . . any . . .

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

political subdivision of a State," but the OSH Act does not define "political subdivision." For the reasons stated below, we affirm in part and in part remand to the Commission for reconsideration in light of this opinion.

## FACTS AND PROCEEDINGS BELOW

Capital Metropolitan Transit Authority (Capital Metro) is a regional area public transit authority in Austin, Texas. It was established about 1985 under Texas law (then Tex. Rev. Civ. Stats art. 1118x), operates under Chapter 451 of the Texas Transportation Code and is a political subdivision of State of Texas. See Tex. Transportation Code § 451.052(a)(1). In December 1991 Capital Metro created StarTran, a Texas nonprofit corporation incorporated under the Texas Non-Profit Corporation Act (Art. 1396-1.01-11.01, Tex. Rev. Civ. Stats.), in order to provide transportation services in Austin while complying with both the Federal Transportation Act and Texas law. The Federal Transportation Act conditions federal funding for transit authorities like Capital Metro on the continuation of existing collective bargaining with employees, while Texas law prohibits public employees from engaging in collective bargaining. See 49 U.S.C. § 5333(b); Tex. Gov't Code Ann. § 617.002 (Vernon 2004).[1]

---

[1] 49 U.S.C. § 5333(b) provides:

"(b) Employee protective arrangements.–(1) As a condition of financial assistance under sections 5307-5312, 5316, 5318, 5323(a)(1), 5323(b), 5323(d), 5328, 5337, and 5338(b) of this title, the interests of employees affected by the assistance shall be protected under arrangements the Secretary of Labor concludes are fair and equitable. The agreement granting the assistance under sections 5307-5312, 5316, 5318, 5323(a)(1), 5323(b), 5323(d), 5328, 5337, and 5338(b) shall specify the arrangements.

(2) Arrangements under this subsection shall include provisions that may be necessary for –

(A) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise;

(B) the continuation of collective bargaining rights;

StarTran has characteristics of both a public and a private entity. A few weeks after it was created by Capital Metro, StarTran and Capital Metro, in December 1991, entered into a written "Agreement for Provision of Employee Support Services" in which Capital Metro designated and appointed StarTran as its "agent to provide Employee Support Services." The agreement has been amended twice, in 1993 and again in 1997. StarTran's duties under the

---

(C) the protection of individual employees against a worsening of their positions related to employment;

(D) assurances of employment to employees of acquired public transportation systems;

(E) assurances of priority of reemployment of employees whose employment is ended or who are laid off; and

(F) paid training or retraining programs."

Texas Government Code § 617.002 provides:

"§ 617.002. Collective Bargaining by Public Employees Prohibited

(a) An official of the state or of a political subdivision of the state may not enter into a collective bargaining contract with a labor organization regarding wages, hours, or conditions of employment of public employees.

(b) A contract entered into in violation of Subsection (a) is void.

(c) an official of the state or of a political subdivision of the state may not recognize a labor organization as the bargaining agent for a group of public employees."

Shortly after StarTran's formation, it contracted with Capital Metro to provide employee services to Capital Metro, services which the record indicates were previously provided to Capital Metro by a different private employee service company (which also served businesses other than Capital Metro) whose employees were unionized and subject to a collective bargaining agreement.

We note that 29 C.F.R. § 215.3(a)(2) provides in part:

"In instances where states or political subdivisions are subject to legal restrictions on bargaining with employee organizations, the Department of Labor will utilize special procedures to satisfy the Federal statute in a manner which does not contravene state or local law."

agreement include employing workers for the area mass transit system and negotiating collective bargaining agreements with the employees' union. StarTran has the exclusive right to enter collective bargaining agreements, but the agreements must be approved by the Capital Metro board. Capital Metro has approved every bargaining agreement that StarTran has presented to it.

The Agreement for the Provision of Employee Support Services, states that StarTran will "retain absolute and real day-to-day control over all matters relating to the terms and conditions of employment, supervision and control of its employees." Thus, StarTran has authority to hire, fire, promote, and discipline its employees.

Capital Metro developed StarTran's safety program, but StarTran takes a great deal of responsibility in enforcing it. The 1993 amendment to the Agreement reflects that StarTran is responsible for the "safety and other training and claims related services" for its employees. The 1997 amendment added, among other things, language stating that:

> ". . . Capital metro shall have no right to supervise or control the duties and activities of StarTran so as to cause a violation of the provisions of Chapter 617 of the Texas Government Code or 49 U.S.C. Section 5333. It is the intent of the parties that, for purposes of Collective Bargaining, StarTran is an independent corporate entity which shall in no way be deemed to be an affiliate, partner, subsidiary, joint venturer, or otherwise under the control of Capital Metro."

Apart from its collective bargaining agreement with the union representing its employees, StarTran does not serve or contract with any entity other than Capital Metro, and Capital Metro serves as its sole source of financing. Capital Metro pays the salaries of StarTran's board and processes the StarTran paychecks of StarTran employees. The buses and vans operated by StarTran employees are owned by Capital Metro, which fixes their routes and schedules. Bus fares paid are collected by StarTran employees but are all fixed

by and turned over daily to Capital Metro. Capital Metro also provides StarTran, among other things, with all its funding and office supplies, and the two entities share office space in the same building. StarTran's only asset is its employees. StarTran employees do not receive the same benefits as public employees like the Capital Metro employees.

StarTran has been informally treated as a private entity, not a political subdivision, under the National Labor Relations Act (the NLRA), and StarTran has never challenged or questioned that treatment. The NLRA governs the right of private employees to bargain collectively. See 29 U.S.C. § 151. Like the OSH Act, the NLRA covers "employers," but provides that "the term 'employer' shall not include . . . any State or political subdivision thereof . . ." 29 U.S.C. § 152(2). Also like the OSH Act, the NLRA contains no definition of "political subdivision." In NLRB v. Natural Gas Util. Dist. of Hawkins County, Tenn., 91 S.Ct. 1746 (1971), the Supreme Court reversed the NLRB's determination that the Hawkins County, Tennessee, utility District, was not exempt under section 152(2) as a political subdivision of Tennessee. The Court noted that the question was one of federal law, id. at 1748-49, and assumed, without deciding, the correctness of the test generally applied by the NLRB in deciding that question, namely whether such entities are ones "'either (1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate." Id. at 1749. The Court held that as a matter of law the district met the second prong of the NLRB's test since it was administered by individuals who were responsible to public officials.[2] See also Brock v. Chi.

---

[2] However, the Court focused primarily on the facts that the district had broad governmental powers, such as "the power of eminent domain . . . even against other governmental entities," it was declared by the state statute under which it was created to be "a 'municipality' or public corporation," its "records were 'public records'", the governing body had "the power to subpoena witnesses and administer oaths in investigating" its affairs, and

Zoological Soc'y ("Chicago Zoo"), 820 F.2d 909, 910 (7th Cir. 1987) (indicating that the test for determining whether an entity is a political subdivision under the OSH Act is "identical to the formula the National Labor Relations Board has long used to determine whether an entity is a political subdivision exempt from the Board's jurisdiction under [the NLRA]"). Although StarTran has never disputed NLRA coverage, there has been no formal determination by the National Labor Relations Board (the NLRB) as to whether StarTran qualifies as a political subdivision for NLRA purposes.

Finally, the StarTran board is appointed and removable by the Capital Metro CEO. Five of the seven Capital Metro board members are elected officials, while two are hired by the board. The Capital Metro board members select and may remove the CEO of Capital Metro. StarTran's bylaws provide that people who hold certain specified executive positions at StarTran will be on the board of directors of that entity. The CEO of Capital Metro appoints the five members of the StarTran board by controlling who holds these specified executive positions. All members of the board of directors of StarTran are at-will employees of StarTran. They report to the CEO of Capital Metro, who can shift them to different positions at StarTran where they will no longer be on the StarTran board. Thus, the CEO of Capital Metro, who is subject to the control of elected officials, has the power to appoint and remove StarTran board members.

On May 9, 2002, OSHA representatives conducted an inspection of StarTran at StarTran's facility in Austin, Texas. After the inspection, OSHA requested copies of injury and illness data from StarTran pursuant to 29 C.F.R. § 1904.40, and issued StarTran a Citation and Notification of Penalty on July 1,

---

the members of its governing body were "subject to removal under Tennessee's General Ouster Law, which provides procedures for removing public officials from office for misfeasance or nonfeasance." See id. at 1750-51. Nothing of the kind is the case with respect to StarTran or its board of directors.

2002. On July 9, 2002, StarTran indicated that it would not provide these documents to OSHA because it did not consider itself to be covered by the OSH Act. It argued that it does not qualify as an "employer" as that term is defined in the OSH Act because it is exempt from that definition as a "political subdivision" of Texas. 29 U.S.C. § 652(5).

The Secretary of Labor (the Secretary) filed a complaint against StarTran on October 8, 2002, to which StarTran responded on October 29, 2002 with a Motion to Dismiss. OSHA cited StarTran for a violation of 29 C.F.R. § 1904.40 based on StarTran's failure to provide the requested records within four business hours, and proposed a penalty of $500. StarTran contested this citation, but the administrative law judge (ALJ), affirmed the citation and penalty on December 11, 2002. He found that the OSH Act governs StarTran because StarTran is not a political subdivision of the State of Texas and is an employer under section 652(5). StarTran then sought interlocutory review of the ALJ's order, which the Commission denied on January 22, 2003. The ALJ conducted an evidentiary hearing in Austin on April 24, 2003 regarding the case. The ALJ then entered an undated Decision and Order holding that StarTran was subject to the OSH Act, and the jurisdiction of OSHA. The Commission upheld the ALJ ruling in a two-to-one decision issued September 27, 2006. StarTran timely filed a Petition for Review in this court.

## DISCUSSION

We limit our discussion to the issues argued on appeal: whether the Commission erred in holding that StarTran should bear the burden of proving its status as a political subdivision under the OSH Act, and whether the Commission erred in holding that StarTran does not qualify as a political subdivision. For the reasons stated below, we affirm the Commission's decision in part on the burden of proof issue, and remand the case to the Commission for

reconsideration in light of this opinion on the issue of whether StarTran is a political subdivision of Texas for OSH Act purposes.

A.    The Political Subdivision Exemption to the OSH Act

The OSH Act is a federal statute created to assure safe working conditions for employees in the United States.  29 U.S.C. § 651(b).  It imposes various duties on employers to ensure that they provide a safe work place.  29 U.S.C. § 654(a).  An "employer" under the OSH Act is defined as "a person engaged in a business affecting commerce who has employees, but does not include the United States or any State or political subdivision of a State." 29 U.S.C. § 652(5).  Thus, a "political subdivision" of a state is not covered by the OSH Act.  This exemption constitutes "an accommodation between the [OSH] Act's general purpose of ensuring a safe workplace and the states' interest in preserving autonomy in their role as employers." Chicago Zoo, 820 F.2d at 913.

The term "political subdivision" is not defined in the OSH Act.  However, 29 C.F.R. § 1975.5(b), a regulation promulgated by the Secretary of Labor, provides two "[t]ests" for determining whether an entity qualifies as a political subdivision.   Under the tests, an entity is a "State or political subdivision thereof" if it "has been (1) created directly by the State, so as to constitute a department or administrative arm of the government, or (2) administered by individuals who are controlled by public officials and responsible to such officials or to the general electorate."   The regulation goes on to provide "Factors for meeting the tests," stating:

> "Various factors will be taken into consideration in determining whether an entity meets the test discussed above.  Some examples of these factors are:  Are the individuals who administer the entity appointed by a public official or elected by the general electorate? What are the terms and conditions of the appointment? Who may dismiss such individuals and under what procedures? What is the financial source of the salary of these individuals? Does the entity earn a profit? Are such profits treated as revenue? How are the entity's functions financed? What are the powers of the entity and

are they usually characteristic of a government rather than a private instrumentality like the power of eminent domain? How is the entity regarded under State and local law as well as under other Federal laws? Is the entity exempted from State and local tax laws? Are the entity's bonds, if any, tax-exempt? As to the entity's employees, are they regarded like employees of other State and political subdivisions? What is the financial source of the employee-payroll? How do employee fringe benefits, rights, obligations, and restrictions of the entity's employees compare to those of the employees of other State and local departments and agencies?" 29 C.F.R. § 1975.5(c).

The regulation further provides:

"Weight of the factors. The above list of factors is not exhaustive and no factor, isolated from the particular facts of a case, is assigned any particular weight for the purpose of a determination by the Secretary of Labor as to whether a given entity is a "State or political subdivision of a State" and, as such, not subject to the Act as an "employer." Each case must be viewed on its merits; and whether a single factor will be decisive, or whether the factors must be viewed in their relationship to each other as part of a sum total, also depends on the merits of each case." 29 C.F.R. § 1975.5(d).

B.    Burden of Proof

The Commission held that StarTran bore the burden of proving that it falls under the political subdivision exception to the OSH Act's definition of "employer." StarTran contends that in proceedings before the ALJ, the parties litigated the issue of whether StarTran was subject to OSHA's authority under the assumption that it was a jurisdictional issue on which the Secretary bore the burden of proof. Thus, it argues that the Commission should not have addressed this issue because the Secretary did not question the assignment of the burden of in front of the ALJ. StarTran also argues that the Commission erred in concluding that the Secretary did not bear the burden of proof. This court will review the Commission's legal conclusions regarding the burden of proof to determine if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); See also Trinity Marine

Nashville, Inc. v. Occupational Safety and Health Review Comm'n, 275 F.3d 423, 427 (5th Cir. 2001).

StarTran first argues that the Commission should not have addressed the Secretary's argument that StarTran bore the burden of proof because the Secretary first raised this argument in her Responsive Brief to the Commission, and did not raise it before the ALJ. It contends that because the Secretary indicated that the case involved a jurisdictional issue, she stipulated that she bore the burden of proof because the party asserting subject matter jurisdiction has the burden of proving that it exists. See Peoples Nat'l Bank v. Office of Comptroller of Currency of the United States, 362 F.3d 333, 336 (5th Cir. 2004). StarTran also notes that the Secretary never challenged StarTran's assertion during the hearing in front of the ALJ that the Secretary bore the burden of proof. Because a litigant should not be able to raise new issues on appeal, StarTran suggests that the Secretary waived her argument that StarTran bears the burden of proof. See 29 C.F.R. § 2200.92(c) ("The Commission will ordinarily not review issues that the [ALJ] did not have the opportunity to pass upon."). The Secretary argues that the Commission had discretion to address this issue even if neither party raised it in front of the ALJ. She also suggests that the failure to raise this issue did not harm StarTran's ability to develop its case. Finally, she contends that she had a good reason for failing to raise the issue earlier—she was not aware that it was disputed until she read StarTran's opening brief for the proceedings in front of the Commission.

Although the Commission generally does not review issues that the ALJ did not address, it has discretion to do so. 29 C.F.R. § 2200.92(c). In determining whether to address an issue not raised before the ALJ, the Commission may consider factors such as whether there was good cause for failing to raise the issue earlier, the degree to which the proceedings will be disrupted by raising the issue, whether addressing the issue will injure the

10

adverse party's ability to raise a claim or defense, and whether considering the new issue would avoid injustice. Id.

In light of 29 C.F.R. § 2200.92(c), the Commission did not abuse its discretion or act arbitrarily or capriciously by addressing the burden of proof issue. 5 U.S.C. § 706(2)(A). Although the Commission would not normally address such an issue, it had discretion to do so. The Commission did not explain why it chose to address the burden of proof issue, but it could have found that doing so was proper for multiple reasons. First, the Secretary explained that she did not raise the argument earlier because she did not know that the issue was disputed until she read StarTran's opening brief for the proceedings in front of the Commission. Furthermore, StarTran does not demonstrate that it was injured or prejudiced by being required to address the issue in its briefs before the Commission. Finally, StarTran does not argue that it would have presented additional evidence had it known that it bore the burden of proof.[3] Thus, addressing the issue did not harm StarTran's ability to develop its case. Therefore, the Commission did not err in addressing the burden of proof issue raised by the Secretary.

Next, StarTran argues that the district court erroneously concluded that StarTran bore the burden of proving its status as a political subdivision. StarTran contends that whether it is an employer under the OSH Act is a jurisdictional issue, so the Secretary should have had the burden of proof. See Peoples Nat'l Bank, 362 F.3d at 336 ("The party claiming federal subject matter jurisdiction has the burden of proving it exists."). The Secretary argues that this

---

[3] When questioned at oral argument, StarTran indicated that if had it known that it bore the burden of proof, it would have submitted its bylaws as evidence and had the Capital Metro CEO testify regarding who controls StarTran's safety program. However, StarTran did not assert these arguments in either of its briefs. Moreover, the Capital Metro CEO did give some testimony reflecting Capital Metro's relation to the safety program and the bylaws were mentioned several times in the testimony.

11

is not a jurisdictional issue, but an issue of exemption from coverage, so StarTran properly bore the burden of proof. The Commission agreed with the Secretary, and held that whether StarTran is an employer under the OSH Act is an issue of coverage, not of jurisdiction. Thus, it concluded that the burden of proof rests with StarTran to show that it falls within the political subdivision exception to the definition of employer under the OSH Act.

In Arbaugh v. Y&H Corp., 126 S. Ct. 1235, 1238 (2006), the Supreme Court addressed whether the requirement that an "employer" under Title VII have at least fifteen employees is a jurisdictional issue or a delineation of a substantive element of a Title VII claim for relief. The numerical requirement for employees is included in the definition of "employer" under Title VII at 42 U.S.C. § 2000e(b), which states that "[t]he term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees." The Arbaugh Court indicated that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as non-jurisdictional in character." 126 S. Ct. at 1245. As Title VII does not explicitly rank the numerical limitation in the definition of employer as a jurisdictional issue, the Court concluded that it was an element of the plaintiff's claim for relief. Id.

Like the Title VII definition of employer, the OSH Act's definition of employer does not rank the political subdivision limitation as jurisdictional. Thus, the Commission properly concluded that whether StarTran is a political subdivision is not a jurisdictional issue. See id. However, the Arbaugh court indicated that the numerical limitation was an element of the plaintiff's claim for relief. Id. This implies that the Secretary must prove, as an element of her claim in this case, that StarTran is not a political subdivision. Id. However, the Supreme Court suggested that this is not the case in NLRB v. Kentucky River Cmty. Care, Inc., 121 S. Ct. 1861, 1866 (2001).

In Kentucky River, the Supreme Court approved the NLRB's rule that the party asserting the "supervisory exception" to the NLRA has the burden of proving that it applies. Id. at 1866. The definition of "employee" in the NLRA provides that "[t]he term 'employee' . . . shall not include . . . any individual employed as a supervisor." 29 U.S.C. § 152(3). The Court noted that supervisors were "expressly excepted" from the definition of employee. Kentucky River, 121 S. Ct. at 1866. It indicated that as a rule of statutory construction, "the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits." Id. (quoting FTC v. Morton Salt Co., 68 S. Ct. 822, 827 (1948)). Thus, the Court deferred to the NLRB's rule for allocating the burden of proof because it was reasonable and consistent with the NLRA. Id.

Morever, this court has held that the party asserting the private membership club exemption under the Title VII definition of "employer," 42 U.S.C. 2000e(b)(2), has the burden of proving that it does not qualify as an employer. Quijano v. Univ. Fed. Credit Union, 617 F.2d 129, 132 (5th Cir. 1980). The definition of "employer" under Title VII states that "[t]he term 'employer' . . . does not include . . . a bona fide private membership club." 42 U.S.C. § 2000e(b).

Kentucky River and Quijano support the Commission's holding that StarTran should bear the burden of proving that it qualifies for the political subdivision exception. The definitions at issue in Kentucky River, Quijano, and this case all contain language limiting a general definition of an otherwise covered employer or employee (the term "employee" under the NLRA "shall not include" supervisors, the term "employer" under Title VII "does not include" private clubs, the term "employer" under the OSH Act "does not include" political subdivisions). 29 U.S.C. § 152(3); 42 U.S.C. § 2000e(b); 29 U.S.C. § 652(5). Under Kentucky River and Quijano, this limiting language creates an

"exemption under a special exception to the prohibitions of a statute," which indicates that the party asserting the exemption has the burden of proving it applies. Kentucky River, 121 S. Ct. at 1866; Quijano, 617 F.2d at 132. On the other hand, Arbaugh suggests that when a limitation is contained in the initial general statement of the affirmative statutory definition ("[E]mployer means a person . . . who has fifteen or more employees"), rather than as a subsequently stated exception to it, it should be treated as an element of the plaintiff's claim and the plaintiff should bear the burden of proving it. 42 U.S.C. § 2000e(b); Arbaugh, 126 S. Ct. at 1245. Because the definition of employer in the OSH Act contains limiting language comparable to that in the definitions of employee and employer at issue in Kentucky River and Quijano, it should be treated as an exemption for which StarTran bears the burden of proof instead of as an element of the Secretary's claim. Thus, the Commission properly concluded that StarTran should bear the burden of proving that it is exempt from the OSH Act as a political subdivision.

C.      Whether StarTran is a Political Subdivision of Texas

StarTran argues that the Commission erred in concluding that StarTran does not qualify as a political subdivision of Texas. The Secretary agrees with the Commission's holding, but interprets 29 C.F.R. § 1975.5 in what appears to be a slightly different manner than the Commission. This court reviews the Commission's factual findings to determine whether they are supported by substantial evidence in the record taken as a whole. 29 U.S.C. § 660(a). It reviews the Commission's legal conclusions to determine if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A); Trinity Marine Nashville, 275 F.3d at 427.

In a two-to-one decision, the Commission held that StarTran does not qualify as a political subdivision under the OSH Act and, therefore, is subject to

OSHA's jurisdiction.[4] In its decision, the Commission indicated that whether StarTran is a political subdivision depends on whether it can satisfy the second test set forth in 29 C.F.R. 1975.5(b) by showing that it is "administered by individuals who are controlled by public officials and responsible to such officials or to the general electorate." It found "three factors to be particularly significant: the lack of public control over StarTran; StarTran's responsibilities for safety and health; and the fact that StarTran seeks to be viewed as an independent entity in other contexts."[5] It did not address the other factors listed in 29 C.F.R. § 1975.5(c).[6] The Commission concluded that although it is a "close

---

[4] The decision was written by Chairman Railman, with Commissioners Rogers and Thompson concurring in part and dissenting in part. Commissioner Rogers dissented in part from the Chairman's decision on the grounds that the case was not properly before the Commission. An ALJ's decision becomes a final order within thirty days unless a Commission member directs it for review within that period. 29 C.F.R. §661(j). Documents circulated to Commission members indicated that the ALJ's decision in this case was docketed on July 30, 2003 and would become final on August 29, 2003, when in reality, the decision was docketed one day earlier, and should have become final on August 28, 2003. Thus, a Commissioner directed the case for review on August 29, 2003, thirty-one days after the ALJ's decision was docketed. Commissioner Rogers dissented on the basis that the ALJ's decision was final on August 28, 2003, and the case was not properly brought before the Commission. However, he agreed with the Chairman's conclusion regarding StarTran's status as an employer under the OSH Act. Commissioner Thompson concurred with Chairman Railman's conclusion that the case was properly before the Commission, but dissented on the grounds that he would hold that StarTran qualifies as a political subdivision under the OSH Act. As the issue of whether this case was properly before the Commission was not raised by either party, we need not address it at this time.

[5] In setting forth its "public control" factor, the Commission cites Chicago Zoo, 820 F.2d at 913, for the proposition that "the record lacks sufficient evidence to show that StarTran met the political subdivision exemption because it was 'administered by individuals who are controlled by public officials and responsible to such officials or to the general public.'" This "factor" is actually the test for determining whether StarTran is a political subdivision. It is not one of the factors listed in 29 C.F.R. § 1975.5(c) for determining whether an entity satisfies the political subdivision test. However, § 1975(d) indicates that the § 1975.5(c) list of factors is not exhaustive.

[6] The Commission was not necessarily required to look to other factors as the regulation states that "[e]ach case must be viewed on its merits; and whether a single factor will be decisive, or whether the factors must be viewed in their relationship to each other as part of a sum total, also depends on the merits of each case." Id. at § 1975.5(d).

case," StarTran did not carry its burden of proving that it is exempt from coverage under the OSH Act.

The Commission determined that StarTran is not subject to public control because it is not responsible to the general electorate, and evidence does not indicate that the individuals who administer the entity are controlled by Capital Metro.[7] It concluded that StarTran is controlled by its own board and the terms of its collective bargaining agreement with the union. In reaching this conclusion it emphasized that StarTran has "day-to-day control over all matters relating to the terms and conditions of employment."

Under this section of its opinion, the Commission also indicated that had StarTran included its bylaws, it may have been able to establish that it qualifies as a political subdivision because it is controlled by public officials.[8] The

---

[7] StarTran does not argue that it is simply the alter-ego of Capital Metro, or that its separate corporate existence should be disregarded under Texas law, so that both entities should be treated as political subdivisions. Although such an argument might have force under Texas law, if successful, it might render StarTran a public entity for all purposes under Texas law, which would prevent StarTran from bargaining collectively with its employees, which would prevent Capital Metro from receiving federal funding. Furthermore, the fact that Capital Metro has been involved with the creation and operation of StarTran does not necessarily mean that the two entities should be treated as one. See United States v. Bestfoods, 118 S. Ct. 1876, 1884 (1998) (stating, in a case involving a wholly owned subsidiary, that "[i]t is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."). Capital Metro's close involvement with StarTran does not necessarily render StarTran a political subdivision like Capital Metro because a subsidiary is not necessarily treated the same as its parent.

[8] The Commission opinion states: "Perhaps, had StarTran introduced its by-laws or other evidence regarding its corporate structure that could indicate it was subject to external control, StarTran may have been able to establish that it was 'administered by individuals who are controlled by public officials and responsible to such officials or to the general public.' . . . Indeed, in NLRB cases involving the political subdivision exemption under the NLRB, courts in determining the exemption have found decisive the fact that an entity's by-laws subject it to outside control. See NLRB v. Princeton Mem'l Hosp., 939 F.2d 174, 175 (4th Cir. 1991) (hospital exempt where bylaws of hospital provided that the affairs of the corporation were managed by its Board of Directors, whose members were subject to ratification and removal by the Princeton Municipal Council). . . . StarTran's failure to provide any such evidence here further weakens its claims of control by Capital Metro."

Commission noted that in cases involving the political subdivision exception to the NLRA, courts have found important the fact that an entity's bylaws subject its board of directors to "outside control." In support of this proposition, it cited NLRB v. Princeton Mem'l Hosp., 939 F.2d 174, 175 (4th Cir. 1991), a case in which the Fourth Circuit held that the Princeton Health Care Center was exempt from NLRA coverage as a political subdivision in part because it was operated by the Princeton Memorial Hospital, whose board members were subject to ratification and removal by a public entity.[9] It also cited Jefferson County Cmty. Ctr. for Developmental Disabilities, Inc. v. NLRB, 732 F.2d 122, 125-26 (10th Cir. 1984), overruled on other grounds by Aramark Corp. v. NLRB, 179 F.3d 872, 882 (10th Cir. 1999), a case in which the Tenth Circuit found that an entity was not a political subdivision in part because a majority of its board was not appointed or removable by public officials or the electorate. The Commission concluded that "StarTran's failure to provide any such evidence here further weakens its claims of control by Capital Metro."

The Commission also found that it was "of considerable significance" that StarTran was responsible for the daily maintenance of the safety and health of its employees because ensuring safety and health of employees is the purpose of the OSH Act. Finally, the Commission discussed StarTran's treatment under federal and state laws. It noted that StarTran seeks to be an independent entity under Texas law, but does not dispute that it is subject to the NLRA, and does not assert the political subdivision exception to that act. Upon review of these

---

[9] The Princeton Memorial Hospital court described the relationship between the Center and other governmental bodies as follows: "the Center was established and operated under the authority of Princeton Memorial Hospital, whose five board members are selected from, approved by, and subject to removal by the board of Princeton Community Hospital, whose directors in turn are subject to ratification and removal by the Princeton Municipal Council and whose membership must include the Mayor of the City of Princeton." 939 F.2d at 178 n.5.

three factors, the Commission concluded that StarTran does not qualify for the political subdivision exception to the OSH Act.

Only five cases, including two cases from federal courts of appeals, have cited 29 C.F.R. § 1975.5. See, e.g., Tricil Res., Inc. v. Brock, 842 F.2d 141, 142-43 (6th Cir. 1988); Chicago Zoo, 820 F.2d at 910. In Chicago Zoo, the Seventh Circuit reversed the Commission's holding that the Chicago Zoological Society (the Zoo Society) was a political subdivision of the state. 820 F.2d at 910. The court found that the Zoo Society clearly failed the first branch of the test set forth in 29 C.F.R. § 1975.5(b), and addressed whether it was administered by people who are controlled by public officials. Id. at 910-11. Despite the Zoo Society's financial dependence on a governmental body, the court held that the Zoo Society was not a political subdivision because the government did not directly control the zoo operations and management, the corporate structure of the Zoo Society did not include public officials, and the nature of the employment relationships was "indisputably private." Id. at 912. It emphasized that when the Commission determined that the Zoo Society was a political subdivision, it erred by giving too little weight to the Zoo Society's structure and the non-public nature of the zoo employee's jobs. Id. at 913. It stated that "[a]bsent direct evidence of control" it would not infer that because the Zoo Society relied on public funding, it was not a private entity. Id.

In Tricil, the Sixth Circuit upheld the decision of the Commission that Tricil Resources, Inc. (Tricil) was not a political subdivision. 842 F.2d at 141. Like the Chicago Zoo court, the Sixth Circuit analyzed whether Tricil satisfied the second prong of the political subdivision test. Id. at 143. It held that, although many factors supported the contention that Tricil should be exempt from the OSH Act, including the fact that the city exercised "substantial fiscal control" over its operations, Tricil did not qualify as a political subdivision. Id. at 143. In support of its proposition, the Court noted that Tricil had independent

authority over its workers and the terms of their employment, that it dealt with their labor unions, that its workers had different employee benefit plans than the city workers, and "most significantly," that Tricil was responsible for its workers' safety. Id. at 143-44.

The Commission's reasoning resembles that outlined in the two cases from our sister circuits discussing the political subdivision exemption from the OSH Act. As was ultimately determined in Chicago Zoo and Tricil, in this case, the Commission found that StarTran was not a political subdivision despite the fact that it receives all its funding from Capital Metro. The Commission found other factors that were discussed in those cases more important, such as the fact that StarTran's operations and management are not fully controlled by Capital Metro. See Chicago Zoo, 820 F.2d at 912. Furthermore, Tricil supports the Commission's claim that StarTran's responsibility for its workers' safety and health constitutes an important factor, as the Tricil court held that this factor is especially significant because the OSH Act is primarily concerned with the safety and health of workers. 842 F.2d at 144.

However, this case contains at least two important differences from Chicago Zoo and Tricil. In Chicago Zoo, the governmental body that funded the Zoo Society did not have the power to appoint and remove Zoo Society board members or officials, while in this case, the Capital Metro CEO has the power to appoint and remove individuals from the StarTran board. 820 F.2d at 912. Furthermore, unlike StarTran, the Society was originally formed with the help of state officials as a private nonprofit corporation, and only later did the Forest Preserve of Cook County become involved in the Beckfield Zoo operations. Id. at 910-11. Likewise, the Zoo Society's functions were never limited to operating the Beckfield Zoo. Similarly, Tricil was an existing private for-profit coproration both before and after it contracted with the City of Akron to operate Akron's facility in question, and apparently thereafter continued to operate other

19

facilities for other clients. Tricil, 842 F.2d at 141. StarTran was created by Capital Metro, a government entity, and has never either existed independently of Capital Metro or served other clients.

The Commission's opinion is problematic in that it does not acknowledge the evidence that the StarTran board may be removed by the Capital Metro CEO.[10] The Commission asserted that StarTran did not produce its bylaws or any other evidence regarding its corporate structure that could indicate that it is subject to external control. See note 8 supra. This statement is incorrect because the relevant corporate structure of StarTran was adequately demonstrated in the testimony provided in the hearing before the ALJ on April 24, 2003. The undisputed and unobjected to evidence (including references to the StarTran by-laws) presented at the hearing clearly demonstrated that StarTran's five person board is controlled by and responsible to Capital Metro's CEO, who has the power to appoint and remove all StarTran board members (who are all at will employees, removable from their positions, as well as from their status as employees, by the Capital Metro CEO) from their positions. The ALJ in essence acknowledged this in his Decision and Order of July 23, 2003. It is also clear that the Capital Metro CEO is subject to the control of public officials as he is selected by the Capital Metro board, five out of seven of whom are elected officials. The Secretary has never disputed any of this.[11] Thus, the

---

[10] However, the Commission does acknowledge that StarTran's board members are appointed by the Capital Metro CEO.

[11] See, e.g., the "Secretary's Responsive Brief" before the Commission:

"Organizational Structure of capital Metro and StarTran

Capital Metro's board of directors consists of five publicly elected officials and two private individuals hired by the board. The board employs Chief Executive Officer (CEO) Fred Gilliam. (record citations).
StarTran's board of directors is composed of five persons who are members of the board by virtue of the fact that they occupy certain specified positions at StarTran, including but not limited to, Ken McCulloch, the

Commission's factual finding that StarTran did not demonstrate that its board of directors is subject to the external control of public officials is not supported by substantial evidence in the record. See 29 U.S.C. § 660(a).

The fact that the Commission's opinion cites Princeton Memorial Hospital and Jefferson County suggests that it may have reached a different conclusion had it properly analyzed the evidence regarding Capital Metro's control of StarTran's board. These are two cases involving the political subdivision exception to the NLRA in which our sister circuits discussed the importance of whether the board of an entity is subject to removal by public officials. See Princeton Mem'l Hosp., 939 F.2d at 178; Jefferson County, 732 F.2d at 125-26. The cases suggest that if a public official (or leaders of a concededly public entity) may remove members of the board of the entity in question, that entity is more likely to qualify as a political subdivision. Id. By citing these opinions, the Commission seems to have suggested that if it had acknowledged evidence regarding control of StarTran's board, it may have reached a different conclusion about StarTran's status as a political subdivision.

In light of the Commission's factual error regarding Capital Metro's control of StarTran's board, we must remand this case to the Commission for

---

president and labor relations manager, and Dan Peabody, the director of transportation (record citations). Persons are appointed to these positions as employees of StarTran and may be removed by the CEO of Capital Metro." Ibid." (Id. at 4).

The Secretary's brief in this court likewise states: "StarTran's board of directors is composed of five members, all appointed and removable by the chief executive officer of Capital Metro, five of whose seven board members are publicly elected" (Id. at 18).

The Secretary has never taken the position, either before the ALJ, before the Commission or before this court, that the evidence of Capital Metro's control over the StarTran board and its members, both in their capacity as members of its board in their capacity as StarTran executives, was in any way undermined or rendered incomplete, unpersuasive or incompetent by the absence of a copy of the StarTran by-laws.

reconsideration of whether StarTran should be treated as a political subdivision of Texas under the OSH Act. As StarTran has characteristics of both a political subdivision and a private entity, this issue presents a close call. The evidence is simply not enough to establish conclusively that StarTran either is or is not a political subdivision for OSH Act purposes. Even the evidence that the StarTran board is removable by Capital Metro does not per se conclusively make StarTran a political subdivision. See note 7, supra. Thus, a remand to the Commission– rather than this court either affirming the Commission or rendering judgment for StarTran – is appropriate to allow the Commission to reevaluate the evidence and reach a conclusion not inconsistent with this opinion. See S&H Riggers & Erectors, Inc. v. Occupational Safety and Health Review Comm'n, 659 F.2d 1273, 1283 (5th Cir. 1981) (indicating that fact finding is the role of the Commission and not the role of this court). On remand, the Commission must reconsider all of the evidence, including StarTran's corporate structure as reflected by the undisputed and unchallenged evidence.

Furthermore, on remand, the Commission must defer to the Secretary's interpretation and application of 29 C.F.R. § 1975.5 to this case, to the extent that such interpretation and application is reasonable. Martin v. Occupational Safety and Health Review Comm'n, 111 S. Ct. 1171, 1176 (1991). The OSH Act is unique in that it creates two administrative actors, the Secretary and the Commission. Id. at 1174. The Secretary is responsible for setting and enforcing health and safety standards in the workplace through the exercise of her rule making power, while the Commission is responsible for the adjudicatory functions under the OSH Act. Id. In OSH Act cases in which the Secretary and the Commission have reasonable but conflicting interpretations of an ambiguous regulation promulgated by the Secretary, this court should defer to the Secretary's interpretation. Id. at 1176; see also Chicago Zoo, 820 F.2d at 912 ("[T]he Commission's determination is owed no special deference; it is the

Secretary, not the Commission, who exercises policymaking and prosecutorial authority under the [OSH] Act.").[12] The Court explained that "the power to render authoritative interpretations of OSH Act regulations is a 'necessary adjunct' of the Secretary's powers to promulgate and to enforce national health and safety standards." Martin, 111 S. Ct. at 1176.

The Commission's and the Secretary's interpretations of 29 C.F.R. § 1975.5 seem to differ in one important respect. In her brief, the Secretary emphasizes similar factors as the Commission when interpreting 29 C.F.R. § 1975.5 and applying it to this case, such as the fact that StarTran is responsible the safety and health of its employees and the fact that StarTran seeks to be treated as an independent entity under statutes other than the OSH Act. However, she does not appear to find the Commission's public-control factor significant or determinative. She even mentions two times in her brief that StarTran board members may be removed from their positions by the Capital Metro CEO, but claims that this does not demonstrate that StarTran is a political subdivision. She states that who selects StarTran's board, whether they may be dismissed by Capital Metro, and who pays their salaries, are not important "because the Commission reasonably found that StarTran had contractual autonomy to determine its employment conditions, the implementation of its collective bargaining agreements, and the administration of its safety program." She concludes that "even though all of StarTran's five board members are appointed and removable by Capital Metro's chief executive officer . . . StarTran is not

---

[12] However, the Court noted that "agency 'litigating positions' are not entitled to deference when they are merely appellate counsel's 'post hoc rationalizations' for agency action, advanced for the first time in the reviewing court" because such interpretations are furnished after agency proceedings have terminated and do not constitute an exercise of the Secretary's lawmaking power. Id. at 1179 (citations omitted). As there is no evidence that the Secretary changed her interpretation of 29 C.F.R. § 1975.5 from the time the OSHA representative issued StarTran a fine to the time she began litigating the issue, her interpretation of the regulation is not a "litigating position," and deserves deference.

controlled by Capital Metro in these critical areas." Thus, the Secretary emphasizes StarTran's day-to-day control of its employees instead of Capital Metro's control of StarTran's board. She looks more to the factors set forth in section 1975.5(c) than the actual test set forth in section 1975.5(b), whether StarTran is "administered by individuals who are controlled by public officials and responsible to such officials." The Commission placed emphasis on the actual test by stressing the importance of who actually controls StarTran's leaders.

Because the Commission and the Secretary appear to set forth somewhat different interpretations of the regulation at issue, on remand, the Commission should defer to the Secretary's interpretation, to the extent that it is reasonable, in making its decision regarding whether the evidence reflects that StarTran is a political subdivision of Texas. See Martin, 111 S. Ct. at 1176. We accordingly remand to the Commission for reconsideration, for the Commission to reassess the evidence, recognizing the StarTran's board is controlled by Capital Metro, and render a new judgment not inconsistent with this opinion.

CONCLUSION

The judgment of the Commission is

AFFIRMED IN PART and REMANDED IN PART

FOR RECONSIDERATION.